(No. 56453.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBIN WAYNE OWENS, Appellant.

*Opinion filed April 4, 1984.—Rehearing denied
June 4, 1984.*

SIMON, J., dissenting.

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, and Verlin R.F. Meinz, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Michael B. Weinstein, Kenneth A. Fedinets, and Terence M. Madsen, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

In a jury trial in the circuit court of Will County, defendant, Robin Wayne Owens, was convicted of the murder of George Kallai. At the death penalty hearing requested by the State pursuant to section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(d)), defendant was sentenced to death by electrocution. The trial court stayed imposition of the sentence (87 Ill. 2d R. 609(a)) pending direct appeal to this court. Ill. Const. 1970, art. VI, sec. 4(b); Ill. Rev. Stat. 1979,

ch. 38, par. 9—1(i); 87 Ill. 2d R. 603.

Testimony from various Kankakee and Joliet police officers established that on December 19, 1980, Kankakee police arrested defendant based on information from the Joliet police department that the Will County circuit court had issued a warrant for his arrest on the charge that he had murdered George Kallai. The officers also had information implicating defendant in a December 18 Kankakee County murder. Defendant was informed of his *Miranda* rights and taken to the Kankakee police station, where police officers sought to interrogate him on several different occasions between December 20 and 22. While defendant indicated he did not want to answer questions, he did not request an attorney. Around midday on December 22, two Joliet police officers who were known to defendant arrived at the Kankakee station to question him. According to the officers' testimony at the pretrial hearing, one of them told defendant that they had a warrant for his arrest for a murder in Joliet. Defendant testified that the officers never informed him of this fact, but he stated that he knew he was being held on a charge of homicide. There was also conflicting testimony as to whether defendant signed a written waiver of his *Miranda* rights before or after police questioned him about the Kallai murder, but the trial court ruled that the waiver was signed prior to questioning. Defendant at first denied any involvement in the murder, but upon being informed that police had in their possession an eavesdrop tape of him admitting that he beat and robbed Kallai, and, according to defendant's pretrial testimony, after one of the interrogating officers informed him that Kallai had died of a heart attack instead of from the beating, defendant orally confessed to the robbery and beating of Kallai. He subsequently made the same confession twice more, once in writing and once in a tape recording.

Defendant's pretrial motion to suppress all of the confessions was denied, and they were admitted at trial. That evidence and testimony from defendant's girlfriend, Linda Knox, from the Crescent Lounge bartender, Cynthia Crite, and from the bar owner, Juan Munoz, established that defendant and Knox were at the Crescent Lounge, located at 567 East Jackson Street in Joliet, during the evening of December 9. Owens noticed that 71-year-old Kallai was buying drinks with, as defendant described it, "a handful of money." Defendant urged Knox to try to obtain money from Kallai, apparently in exchange for sexual favors, but Knox testified she did not understand what defendant wanted. Just before the Crescent Lounge closed at 1 a.m., defendant and Knox left, and Kallai left shortly thereafter. Defendant and Knox walked to the vacant house in which defendant stayed at 555 East Jackson, next door to the bar, and defendant pushed Knox inside, leaving her there alone. According to Knox' testimony before the grand jury, defendant was gone for approximately 15 minutes, although at trial she testified that he was absent for less than one minute.

The victim's brother, Louis Kallai, testified that he discovered the body about six o'clock the morning of December 10, near the home the two brothers shared at 324 Youngs Avenue, which was around the corner from the Crescent Lounge. He and a neighbor dragged the body into the Kallais' front yard. An evidence technician with the Joliet police force, Officer Louis Silich, testified that he was sent to the victim's address about 6:15 a.m. on December 10. He found Kallai's body there, dressed appropriately for winter, except that he wore no trousers, and he observed that Kallai's face was bloodied. Officer Silich also testified that upon further investigation that morning he found a blood-stained pair of trousers on a couch in defendant's residence. Louis Kallai identi-

fied these trousers as similar to a pair his brother owned. The forensic pathologist who testified at trial, Dr. Edward Shalgos, could not pinpoint the time of death, but was able to determine that Kallai died because he had received repeated beatings, which induced shock and an irregular heartbeat, eventually resulting in cardiac arrest. Dr. Shalgos stated that the victim's heart had been somewhat weakened by a previous heart attack.

David Toliver was a key witness for the State. Upon his arrest for burglary in Joliet on December 16, Toliver told police about a conversation he had had with defendant on December 12 in which defendant admitted murdering Kallai. The day after Toliver's burglary arrest, Joliet police took a statement to this effect from him and Toliver then agreed to wear an electronic eavesdropping device in defendant's presence in an effort to obtain evidence which would substantiate his statement. At trial Toliver testified as to the statements defendant made to him on December 12 and he also identified certain statements on the eavesdrop tape as defendant's. Toliver related that in his conversation with defendant on the 12th, defendant admitted to murdering Kallai, and he described in detail defendant's account of the robbery and beating that led to the victim's death. According to Toliver, defendant said that Kallai fell to the ground when defendant struck him; defendant then stomped on the victim and removed his trousers so that he could easily reach Kallai's wallet. Again, according to Toliver, defendant said that he then wiped the victim's blood from his hands with a rag, which he later took into the house at 555 East Jackson, along with the victim's trousers. In response to questions from the prosecutor, Toliver identified as defendant's a voice on the eavesdrop tape which spoke of stomping someone, removing his trousers, and taking his wallet. Toliver also testified as

to his own criminal record, which included convictions for burglary, theft and forgery, as well as the burglary charge then pending.

Defendant's handwritten confession admits that he hit and kicked Kallai. In his testimony at trial, however, he denied that he was connected in any way with the murder. He also stated, contrary to his testimony at a pretrial hearing on a motion to suppress his statements to police, that he confessed to robbing and beating Kallai only after one of the officers struck him in the stomach. Defendant also insisted that the voice on the eavesdrop tape was not his.

As previously stated, the jury returned a verdict of guilty and defendant waived his right to a jury at the death penalty hearing requested by the State. Pursuant to our statute (Ill. Rev. Stat. 1979, ch. 38, pars. 9—1(b), 9—1(c), 9—1(h)), the hearing proceeded in two distinct phases. In the first or qualifying phase, which is concerned with determining whether the case is one which contains a section 9—1(b) aggravating factor, the court found that defendant had attained the age of 18 years at the time of the offense and that the State presented sufficient evidence to prove beyond a reasonable doubt the existence of the statutory aggravating factors contained in sections 9—1(b)(3) and 9—1(b)(6). To support a finding that the section 9—1(b)(3) multiple-murder aggravating factor applied, the State first introduced into evidence a certified copy of defendant's conviction in Kankakee County for the murder of Arfrazia Hodges. The State then requested that the court take judicial notice of the jury verdict entered in the instant case finding defendant guilty of murder and felony murder in order to establish the necessary second conviction and satisfy the section 9—1(b)(6) felony-murder aggravating-factor requirement.

The sentencing hearing then proceeded to the second

phase under section 9—1(c), in which the court or jury considers both statutory and nonstatutory aggravating factors, together with any mitigating factors, and determines what penalty shall actually be imposed. The State presented evidence of nonstatutory aggravating factors at this phase of the hearing. An assistant Kankakee County State's Attorney elaborated on the brutality of the Kankakee County murder, and two Joliet police officers testified as to the violent nature of defendant's prior convictions for theft and battery. Also, two Menard Penitentiary corrections officers testified that defendant was one of four death-sentenced inmates involved in attacks on them. Certified copies of defendant's prior convictions were admitted, as was a copy of his adjudication as a juvenile delinquent. The State also offered the opinion testimony of a probation department caseworker in the defendant's juvenile case that defendant's problems did not result from a poor home life. The caseworker's testimony was apparently intended as a rebuttal of any similar evidence which defendant might offer in mitigation.

Defendant's evidence at the second phase of the sentencing hearing consisted of nonstatutory mitigating factors. His girlfriend, Linda Knox, and her mother, Beatrice Knox, testified that during the three-year period defendant had lived with the two of them they had not observed any violent behavior on his part and that, in their opinions, defendant did not deserve the death sentence. Defendant also testified in his own behalf at this phase of the hearing. He stated that he had a ninth-grade education and that he had lived with a succession of relatives prior to his commitment to the juvenile corrections system when he was 16. From the time he was released in late 1979 until December 1980, defendant was unable to find regular work. He accepted gifts of cash from Linda Knox and also gambled to support him-

self.

The court noted that no statutory mitigating factors were present and that it had considered all of the testimony offered by defendant to determine whether any other mitigating factors existed. Defendant's evidence in the second phase of the hearing revealed a background of poverty, relatively little education, and unemployment. The court found that such evidence did not constitute a mitigating factor and interpreted the death penalty statute to mandate a death sentence because aggravating factors were proved beyond a reasonable doubt and no mitigating factors were found to exist.

Defendant argues here that the oral, written, and taped confessions which he gave at the police station on December 22 were obtained in violation of his fifth amendment privilege against self-incrimination and sixth amendment right to counsel and therefore should not have been admitted at trial. Although defendant does not dispute that he was advised of his *Miranda* rights prior to interrogation and that he signed a waiver of those rights, he contends that *Miranda* warnings alone were not sufficient to fully advise him of his constitutional rights. Without knowledge of the significance of the arrest warrant issued for him in Will County and without the information that a complaint for murder had been filed against him, defendant argues that he could not validly waive either his fifth or sixth amendment rights.

As a preliminary matter, we note that the right to counsel provided by the sixth amendment exists independently of the rights which *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, provides under the fifth amendment. (*Edwards v. Arizona* (1981), 451 U.S. 477, 480-82 n.7, 68 L. Ed. 2d 378, 383-84 n.7, 101 S. Ct. 1880, 1883 n.7; *People v. Smith* (1982), 93 Ill. 2d 179, 185.) As to the latter, defendant asserts that this

court's recent decision in *People v. Smith* (1982), 93 Ill. 2d 179, supports his position that he could not validly waive his fifth amendment rights unless, in addition to receiving *Miranda* warnings, he was informed of the existence of the complaint against him and the specifics of his arrest warrant. In *Smith,* this court reversed the trial court's denial of defendant's motion to suppress a confession because an officer had denied his lawyer's request to see him, and although the defendant had thereafter been given *Miranda* warnings prior to making his statement, he had not been told that his attorney had attempted to visit him. Our decision that Smith's fifth amendment rights had been violated rested on the ground that he could not have knowingly and intelligently waived his rights absent the knowledge that his attorney had attempted to visit and confer with him. Here, there is no indication that any attorney attempted to confer with defendant prior to his confession. Since that factual difference was the key to the *Smith* decision, we find that case inapposite.

In the absence of any fact pattern aligning this case with *Smith,* the standard rule for determining the validity of a waiver of fifth amendment rights applies. An express written waiver is persuasive proof of validity, but will not be sufficient alone unless the waiver was voluntarily, knowingly, and intelligently made. (*North Carolina v. Butler* (1979), 441 U.S. 369, 373, 60 L. Ed. 2d 286, 292, 99 S. Ct. 1755, 1757; *People v. Dailey* (1972), 51 Ill. 2d 239, 241.) Here, defendant signed a typewritten form waiving all of his *Miranda* rights, and the trial court determined that he did this prior to making any of his three confessions. Defendant does not now contend that this waiver was obtained involuntarily or that he signed it without knowledge of its future implications. In fact, in his testimony during the suppression hearing, defendant admitted that he was familiar enough with

*Miranda* warnings to realize a waiver meant that whatever he told the police could be used in court. It is, in our judgment, clear that defendant's waiver of his fifth amendment rights was effective.

The question of the validity of a waiver of defendant's sixth amendment right to counsel is more troublesome. The parties agree that the sixth amendment right to counsel does not attach until the commencement of adversarial judicial criminal proceedings (see *Moore v. Illinois* (1977), 434 U.S. 220, 227, 54 L. Ed. 2d 424, 432, 98 S. Ct. 458, 464; *Kirby v. Illinois* (1972), 406 U.S. 682, 689, 32 L. Ed. 2d 411, 417, 92 S. Ct. 1877, 1882; *People v. Burbank* (1972), 53 Ill. 2d 261, 272). They devote considerable argument to the question whether that point has been reached with the filing of a criminal complaint. Although the State has not raised the issue, there is respectable authority that whether adversarial proceedings commence with the filing of a complaint depends on the degree of prosecutorial involvement. In *State v. Johnson* (Iowa 1982), 318 N.W.2d 417, 435, the court held that while the filing of a simple complaint by or at the direction of the prosecutor may constitute the commencement of adversary judicial proceedings, the filing of such a complaint by a police officer in order to secure an arrest warrant, as here, with no indication of prosecutorial involvement, does not necessarily have a similar effect. We note that, to date, neither the Supreme Court (see *Edwards v. Arizona* (1981), 451 U.S. 477, 480 n.7, 68 L. Ed. 2d 378, 383 n.7, 101 S. Ct. 1880, 1883 n.7) nor this court has resolved whether sixth amendment rights automatically attach upon the filing of a complaint. Nor do we find it necessary to resolve that issue here, for, even if we assume, as defendant urges, that they did, it is apparent that the validity of the waiver is not affected.

As previously mentioned, defendant additionally ar-

gues that a higher standard of waiver applies to the waiver of his sixth amendment right to counsel once it has attached. The Supreme Court has expressly reserved ruling on whether a higher standard than that required for *Miranda* waivers should be used to determine whether an accused has waived his sixth amendment right to counsel. (See *Brewer v. Williams* (1977), 430 U.S. 387, 405-06, 51 L. Ed. 2d 424, 441-42, 97 S. Ct. 1232, 1243.) Lower court decisions are split. Compare *United States v. Clements* (4th Cir. 1983), 713 F.2d 1030, 1033-36; *United States v. Mohabir* (2d Cir. 1980), 624 F.2d 1140, 1146; *United States ex rel. Sanders v. Rowe* (N.D. Ill. 1978), 460 F. Supp. 1128, 1140 (waivers of sixth amendment rights must be measured by a higher standard than are waivers of fifth amendment rights), with *Jordan v. Watkins* (5th Cir. 1982), 681 F.2d 1067, 1074; *State v. Carter* (Me. 1980), 412 A.2d 56, 61; *Jordan v. State* (1980), 93 Wis. 2d 449, 462-64, 287 N.W.2d 509, 515 (no distinction between standards of waiver required for fifth and sixth amendment rights).

Defendant contends that, in order for him to intelligently assess the gravity of his situation and make an understanding waiver of his right to counsel, the sixth amendment entitles him to know that a complaint had been filed charging him with murder. But even were we to accept his argument, the waiver is not voided, for the record establishes that defendant in fact possessed somewhat similar information. Although defendant disputed the testimony of the two Joliet police officers, who testified that they told defendant they had a warrant for his arrest for murder, defendant explicitly acknowledged in his suppression-hearing testimony that he knew he was being held for questioning in a murder. Thus, he was aware of the severity of the situation facing him and, since he had been given his *Miranda* warnings, he knew he had the right to have an attorney present during

questioning. Considering these facts, together with defendant's familiarity with the *Miranda* warnings, we have no doubt of the admissibility of the statements irrespective of whether sixth amendment rights had attached at the time the statements were made.

Defendant also argues for a reversal of his conviction because the trial court's decision to limit defense counsel's cross-examination of David Toliver deprived him of his sixth amendment right to confront witnesses against him. The purpose of the attempted cross-examination was to establish that Toliver was armed when he was arrested for burglary December 16, 1980. Defendant maintains that, if he had been able to elicit this fact on cross-examination, it would have shown that the State's Attorney granted Toliver a favor in return for his testimony by failing to charge him with the Class X felony of armed violence (Ill. Rev. Stat. 1979, ch. 38, par. 33A—2). Because only burglary, a lesser crime and a Class 2 felony, was charged, defendant contends that, had cross-examination been allowed to continue, he would have been able to impeach Toliver for bias by showing that the State's Attorney's office filed less than the maximum charge in exchange for Toliver's testimony that defendant confessed to the murder and his identification of defendant's voice on the eavesdrop tape.

The sixth amendment to the Federal Constitution protects the defendant's right of cross-examination (*Davis v. Alaska* (1974), 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110), and this court has held that defendants should be allowed a wide latitude to show bias (*People v. Wilkerson* (1981), 87 Ill. 2d 151, 156). However, the scope of cross-examination rests largely in the discretion of the trial court, and we will overturn its ruling only where an abuse of that discretion results in manifest prejudice to the defendant. (*People v. Kline* (1982), 92 Ill. 2d 490, 504.) Even if we as-

sume, *arguendo,* that Toliver was sufficiently well versed in criminal law to know that the State could have filed the more serious armed-violence charge against him and that he consequently would be inclined to testify favorably for the State, it is apparent that defendant suffered no real prejudice here. The record reveals that the jury heard other evidence of Toliver's potential bias, such as the following colloquy between the attorney for the State and Toliver:

"Q. When you told them about what Mr. Owens said to you, did you think it might help your case out?

A. Sure. ***"

The jury also heard evidence of Toliver's substantial criminal record, including the then-pending burglary charge. It would thus appear that ample impeachment evidence was presented from which the jury could judge Toliver's credibility and the error, if any, in limiting the cross-examination was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 22, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 827; *People v. Bryant* (1983), 94 Ill. 2d 514; *People v. Wilkerson* (1981), 87 Ill. 2d 151, 157.

Defendant also urges that his conviction should be reversed because various comments the prosecutor made during closing argument deprived him of his right to a fair trial. Defense counsel did not object to any of the allegedly prejudicial remarks, and any error would normally be considered waived unless the comments were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process (*People v. Albanese* (1984), 102 Ill. 2d 54; *People v. Tiller* (1982), 94 Ill. 2d 303, 321; *People v. Smothers* (1973), 55 Ill. 2d 172, 176). We have, however, considered the comments which defendant contends constitute prejudicial error and we cannot say the remarks were of such a nature that either of these standards was met.

Defendant contends that the prosecution's characterization of Linda Knox, a defense witness, as a liar was improper. While under oath this witness gave two different accounts of the events of the evening George Kallai was robbed, beaten and left to die, and the differences do not appear inadvertent. The logical inference was that Linda Knox lied on one occasion or the other, and we are aware of no reason why the prosecutor may not point that probability out to the jury. In *People v. Hairston* (1970), 46 Ill. 2d 348, 375, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658, we held that a prosecutor's statement based on proof or legitimate inferences deducible from the proof does not transcend the bounds of legitimate argument. The same rule governs two other prosecution comments to which defendant now objects. The State's Attorney remarked that there was overwhelming evidence that a murder was committed during the course of a robbery and also referred to defendant as "that convict." The record reveals that a considerable amount of evidence existed to support the inference that the murder was committed during the course of a felony. Furthermore, defendant's convictions for armed robbery and theft had been admitted into evidence, so the jury was already aware of his status as a "convict." Because both of these statements were based on proof previously presented to the jury, they were neither improper nor prejudicial. *People v. Albanese* (1984), 102 Ill. 2d 54.

Defendant also urges that the prosecutor unfairly appealed to the jury's fears and prejudices with the following comment:

> "It's a sad commentary on modern America that people all too often become prisoners in their homes at night. They are afraid to walk the streets because they fear exactly what happened to George Kallai would happen to them."

This comment, which dwells upon the evil results of

crime, was not improper. (*People v. Jackson* (1981), 84 Ill. 2d 350, 360; *People v. Hairston* (1970), 46 Ill. 2d 348, 375, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658; *People v. Williams* (1962), 26 Ill. 2d 190, 194.) The final comment which defendant regards as prejudicial is the following statement by the prosecutor, made in rebuttal to defendant's argument that he did not murder the victim because death was due to cardiac arrest:

"It is an absolute disgrace to talk about this [case] being an inadvertent homicide."

Although this statement is somewhat ambiguous in that it is unclear whether the prosecutor was criticizing defense counsel (see *People v. Monroe* (1977), 66 Ill. 2d 317, 323), or the illogical character of the argument, we do not consider it improper in the context in which it was made.

Having determined that no reversible error occurred during the guilt phase of defendant's trial, we next consider allegations of error at the sentencing proceeding. Defendant argues that the trial court erred in finding two aggravating factors present under section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)) because he did not receive notice that the State intended to rely on the aggravating factor dealing with convictions for two or more murders (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)). Defendant does not dispute that he had sufficient notice that the section 9—1(b)(6) felony-murder aggravating factor would be used to seek the death penalty. As a threshold matter, it should be noted that under section 9—1(b), it is clear that the death penalty may be imposed if only one aggravating factor is found to exist, and it is not necessary, as defendant's argument implies, that more than one such factor be found.

Defendant argues that because the State sought the death penalty based, in part, on section 9—1(b)(3), a multiple-murder aggravating factor which the indictment did

not charge, he was without adequate pretrial notice that the death penalty would be sought. First, as a practical matter, no murder convictions could have been charged in the indictment because none had been obtained against defendant. Second, assuming that defendant did have prior murder convictions, it would not have been necessary to allege them as a section 9—1(b)(3) aggravating factor in the indictment. In *People v. Davis* (1983), 95 Ill. 2d 1, 29, this court stated that, while it would be "preferable" to mention the appropriate aggravating factors in indictments because such a practice would clearly obviate any later claims that notice was insufficient, there was no constitutional requirement that any aggravating factors be charged. The functions of an indictment are to inform the accused of the offense with which he is charged so that he may prepare a defense and to protect against subsequent prosecutions for the same crime. These objectives are satisfied when a murder indictment charges a defendant under section 9—1(a); since aggravating factors are not necessary elements of the offense, they need not be charged. Here, the indictment was constitutionally sufficient because it charged defendant with the offense of murder.

Furthermore, the record clearly establishes defendant's knowledge that the death penalty would be sought. (*Cf. People v. Gaines* (1981), 88 Ill. 2d 342, 369.) Defendant's pretrial motions disclose his knowledge of the State's intention, for he there asked the court to declare the death penalty unconstitutional and moved for special jury-selection procedures based on his belief that the prosecution would seek the death penalty. Also, at a hearing on a presentence motion for a bill of particulars, the State notified the defendant that the death penalty would be sought based on both the 9—1(b)(3) and 9—1(b)(6) aggravating factors. We accordingly find that defendant had ample notice that the death penalty would be requested based on the presence of both aggravating factors.

Defendant next argues that the trial court improperly found that his earlier Kankakee County murder conviction established the necessary second conviction for the section 9—1(b)(3) aggravating factor to apply. He alleges that there was insufficient evidence that the Kankakee County murder was a premeditated act and that his death sentence must therefore be vacated. This argument is based on the incorrect premise that section 9—1(b)(3) applies only to prior murder convictions for premeditated murders. In *People v. Davis* (1983), 95 Ill. 2d 1, 31-36, we reviewed the language of section 9—1(b)(3) in light of its legislative history and concluded that this aggravating factor includes prior murder convictions resulting from intentional or knowing acts as well as those which are premeditated. That holding is dispositive here.

Defendant further contends that the trial court incorrectly found the section 9—1(b)(6) felony-murder factor applicable to his case because the court failed to find that he intentionally killed his victim. Although section 9—1(b)(6)(b) makes the felony-murder factor applicable either where the defendant kills intentionally or with knowledge that his actions create a strong probability of death or great bodily harm, defendant urges that unless he is found to have the intent to kill, his death sentence is disproportionate to the crime and must be vacated. We do not agree. In *People v. Eddmonds* (1984), 101 Ill. 2d 44, 67-68, this court explained the legislature's rationale for making the death penalty applicable to a murder that occurs during the commission of another felony and upheld a death sentence for felony murder where there was no finding of an intent to kill. In this case, the trial court properly found, in accordance with the alternative language of section 9—1(b)(6)(b), that defendant killed with knowledge that his actions created a strong probability of death or great bodily harm. Defendant's death sentence is not subject to attack on this basis.

Defendant next raises four related arguments, all of which deal with the scope of evidence introduced at the second phase of his sentencing hearing. He first contends that it is unconstitutional to admit any evidence of nonstatutory aggravating factors, and cites the following examples of nonstatutory evidence which he alleges were erroneously admitted in aggravation: his post-trial attack on a corrections officer, details of his prior crimes, and his juvenile record. Although defendant did not object to any of this evidence at the sentencing hearing on the grounds he now urges, we will briefly consider his arguments.

Defendant urges that if any evidence unrelated to a statutory aggravating factor is admitted during the second phase of the sentencing hearing, this impermissibly broadens the discretion of the sentencing body, resulting in arbitrary and capricious administration of the death penalty, contrary to the dictates of *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726. In support of this general proposition, defendant cites *Henry v. Wainwright* (5th Cir. 1981), 661 F.2d 56, *vacated and remanded on other grounds* (1982), 457 U.S. 1114, 73 L. Ed. 2d 1326, 102 S. Ct. 2922, *aff'd on remand* (1982), 686 F.2d 311. In *Henry,* the fifth circuit held that an instruction permitting jurors to consider nonstatutory aggravating factors was unconstitutional because it would lead to the arbitrary and unguided imposition of the death penalty. This court examined the *Henry* decision in *People v. Free* (1983), 94 Ill. 2d 378, 427, and found it inapposite to Illinois capital cases because the Florida death penalty statute involved in *Henry* provided only a one-step sentencing procedure, whereas our legislature has established a two-step procedure. Under our statute, the death penalty is authorized only after the judge or jury is satisfied beyond a reasonable doubt that the State has proved a statutory aggravating factor. Only when this requirement has been satisfied may the court admit evidence regarding nonstatutory ag-

gravating factors and any mitigating factors. In *Free,* we concluded that the more carefully defined Illinois sentencing procedure provided sufficient insurance against the arbitrary and capricious imposition of the death penalty. We find no persuasive reason to depart from that holding.

Our opinion in *People v. La Pointe* (1981), 88 Ill. 2d 482, is dispositive of defendant's argument that proof of misconduct not resulting in criminal convictions is improper at the second or "balancing" stage of the sentencing hearing, as well as any contention that hearsay proof is improper. The important concerns, as *Free* and *La Pointe* emphasize, are the relevancy and reliability of the proffered evidence. Defendant here did not at trial challenge the accuracy of the evidence, objecting only to the hearsay manner of its presentation.

Defendant asserts also, relying on *Cozzolino v. State* (Tenn. 1979), 584 S.W.2d 765, that evidence of conduct occurring subsequent to the offense for which he was being sentenced was improperly received by the sentencing court. Defendant misreads *Cozzolino.* The Tennessee court there construed its statute which, unlike ours, contained no authorization for the proof of aggravating or mitigating factors other than those specified in the statute. Consequently, the Tennessee court held proof of misconduct unrelated to the statutorily specified factors was irrelevant and reversible error. In contrast, our statute in section 9—1(c) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)) specifies: "The court shall consider *** any aggravating and any mitigating factors which are relevant to the imposition of the death penalty. Aggravating factors may include *but need not be limited to* [those listed]. Mitigating factors may include but need not be limited to [those listed]." (Emphasis added.) Thus, the controlling question here is whether the evidence in question was relevant to the imposition of the death penalty. *People v. Free* (1983), 94 Ill. 2d 378, 422.

In *People v. La Pointe* (1981), 88 Ill. 2d 482, this court

reviewed earlier holdings of the Supreme Court and this court as to the scope and type of proof required for evidence at sentencing hearings. Noting that, "[i]n implementing the concept that punishment should fit the offender and not merely the crime, the Supreme Court has repeatedly affirmed the 'fundamental sentencing principle' that 'a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come' (*Roberts v. United States* (1980), 445 U.S. 552, 556, 63 L. Ed. 2d 622, 628, 100 S. Ct. 1358, 1362; *Williams v. New York* (1949), 337 U.S. 241, 247, 93 L. Ed. 1337, 1342, 69 S. Ct. 1079, 1083)" (*People v. La Pointe* (1981), 88 Ill. 2d 482, 496), and that, in *Williams*, the Supreme Court stated that " 'highly relevant—if not essential—to his [the judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics' " (88 Ill. 2d 482, 497), this court concluded that the important considerations in determining admissibility were the relevance and reliability of the proffered proof. In our later opinion in *Free*, we observed:

> "The rules of evidence, as provided in section 9—1(e), are suspended at this stage, so that the judge or jury, as the sentencing authority, may have all relevant evidence before it. In this phase of the sentencing hearing, the State and defendant are allowed considerable leeway in the presentation of relevant evidence as long as the evidence is also reliable." (*People v. Free* (1983), 94 Ill. 2d 378, 422.)

We also observed:

> "In *Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978, the court noted the importance of placing before the sentencing jury all relevant factors and circumstances focusing on the character and the record of the individual offender and the circumstances of the particular offense." (94 Ill. 2d 378, 422.)

In *La Pointe*, this court regarded defendant's lack of remorse and callous attitude following his crime as relevant in determining an appropriate sentence. Our earlier opinions in death penalty cases indicate proof of post-offense conduct was admitted and considered at the sentencing hearing. (See *People v. Gaines* (1981), 88 Ill. 2d 342 (post-offense conduct included evidence that defendant threatened to kill two women if they did not give him money, threatened deputy sheriffs, and carried concealed weapons); *People v. Carlson* (1980), 79 Ill. 2d 564 (mitigating factor included evidence that, following his arrest, defendant gave a friend $3,200 to pay for his son's education); see also *People v. Caballero* (1984), 102 Ill. 2d 23, and *People v. Albanese* (1984), 102 Ill. 2d 54 (proper to consider defendant's lack of remorse in death sentence hearing).) Given the emphasis in the opinions of the Supreme Court and this court upon presenting to the sentencing judge or jury all information relevant to the imposition of the death penalty, together with the absence from our statute of any indication that proof of post-offense behavior, good or bad, is precluded, we see no reason to hold inadmissible the proof of subsequent convictions or misconduct here presented. In our judgment, defendant's post-trial attack on a corrections officer demonstrated a continuing disposition toward criminal conduct which was, in the language of the statute, "relevant to the imposition of the death penalty."

Defendant also argues that evidence as to the details of the crimes underlying his prior convictions should not have been admitted since it was of little relevance and great prejudice. We disagree. In *People v. Adkins* (1968), 41 Ill. 2d 297, 301, we held that it was not error to permit testimony at a sentencing hearing concerning details of crimes for which the defendant had been previously convicted, and we recently reaffirmed our *Adkins* holding in *La Pointe*. Defendant urges, too, that admission in the second stage

of the sentencing hearing of evidence of his juvenile record was improper. The relevant statutory provision of the Juvenile Court Act (Ill. Rev. Stat. 1979, ch. 37, par. 702—9(2)) in effect at that time expressly permitted consideration of prior juvenile adjudications in subsequent criminal sentencing proceedings. See also *People v. Wunnenberg* (1981), 85 Ill. 2d 188, 194. But see, too, a recent amendment to the Act (Ill. Rev. Stat., 1982 Supp., ch. 37, par. 702—10(b)) which apparently limits such proof of juvenile adjudications in sentencing hearings to those hearings conducted under the Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1001—1—1 *et seq.*).

Defendant also urges that if this court reverses either the death sentence or the conviction in the Kankakee County case, his death sentence in this case must be vacated and the case remanded for resentencing. Vacation of the death sentence there, however, would not affect our disposition of the death sentence here because, contrary to the implications of defendant's argument, the section 9—1(b)(3) multiple-murder aggravating factor would continue to apply. That section is applicable on its face whenever "the defendant has been *convicted* of murdering two or more individuals ***" (emphasis added) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(3)), regardless of whether a death sentence has been imposed for those convictions.

Nor would reversal of the Kankakee County conviction produce a different result here. While such a reversal would eliminate the section 9—1(b)(3) aggravating factor of multiple murders, the section 9—1(b)(6) felony-murder factor remains. The court also found no mitigating factors were present. In these circumstances, where a single aggravating factor is found, with no mitigating factor to be weighed against it, section 9—1(h) requires imposition of the death sentence: "If the Court determines that there are no mitigating factors sufficient to preclude the imposition of the death sentence, *the Court shall sentence the*

*defendant to death."* (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(h).) We have previously interpreted as mandatory the emphasized language in the context of the parallel provision in section 9—1(g) which governs procedure when the defendant elects to have a jury make the sentencing decision. In *People v. Gaines* (1981), 88 Ill. 2d 342, 373, *cert. denied* (1982), 456 U.S. 959, 72 L. Ed. 2d 482, 102 S. Ct. 2285, we held, based upon our prior decision in *People v. Lewis* (1981), 88 Ill. 2d 129, 150-51, that: "[N]o sentencing options were available to the court, for it was *required* to sentence the defendant to death after the jury returned a verdict that there were no mitigating factors sufficient to preclude that sentence." (Emphasis added.) Since the legislature has chosen to use the same restrictive language in both section 9—1(g), which governs sentencing by juries, and section 9—1(h), which governs sentencing by the court, we now hold that section 9—1(h) similarly curtails judicial discretion. When there is no mitigating factor for the court to weigh against an aggravating factor that has been found to exist beyond a reasonable doubt, the statute obligates the judge to impose the death sentence, as the sentencing court here observed.

The remainder of defendant's arguments are general constitutional challenges to the death penalty statute which this court has previously resolved. The court has determined that the statutory grant of discretion to the prosecutor is valid under the eighth amendment's prohibition against cruel and unusual punishment (*People v. Szabo* (1983), 94 Ill. 2d 327, 351; *People v. Brownell* (1980), 79 Ill. 2d 508, 527, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 540-43, *cert. denied sub nom. Brown v. Illinois* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603) and does not violate the separation of powers provision of the Illinois Constitution (Ill. Const. 1970, art. II, sec. 1; *People v. Brownell* (1980), 79 Ill. 2d 508, 527-28;

*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, 535-39). Nor is the statute invalid under the eighth or fourteenth amendments because it fails to require the State to prove beyond a reasonable doubt the absence of mitigating factors in order for the death penalty to be imposed. (*People v. Silagy* (1984), 101 Ill. 2d 147; *People v. Kubat* (1983), 94 Ill. 2d 437, 504.) This court has also held that the death penalty statute provides for adequate comparative review and is therefore valid under the eighth amendment and the due process clause of the fourteenth amendment (*People v. Kubat* (1983), 94 Ill. 2d 437, 502-04; *People v. Brownell* (1980), 79 Ill. 2d 508, 541-44). Inherent in our consideration of capital cases is a comparative review by us of appeals from death sentences which have previously come before this court and the disposition of those cases. (*People v. Free* (1983), 94 Ill. 2d 378, 427-30.) We consider this procedure adequate to insure a reasonable degree of uniformity. *Pulley v. Harris* (1984), 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871.

For the reasons stated, we affirm the judgment of conviction and sentence of death of the circuit court of Will County. The clerk of this court is directed to enter an order setting Monday, September 17, 1984, as the date on which the sentence of death entered by the circuit court of Will County shall be executed. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center, and to the warden at the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, dissenting:

I dissent from the imposition of the death sentence be-

cause I believe that the Illinois death penalty statute is unconstitutional. As I explained in my dissents in *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting), and *People v. Silagy* (1984), 101 Ill. 2d 147 (Simon, J., dissenting), when a substantial constitutional question is presented, the legal doctrine of *stare decisis* should not dictate the outcome. Four members of this court have stated that the decision in *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, is incorrect. (77 Ill. 2d 531, 544 (Ryan, J., dissenting, joined by Goldenhersh, C.J., and Clark, J.); *People v. Lewis* (1981), 88 Ill. 2d 129, 179 (Simon, J., dissenting).) I believe that the defendant's due process rights are violated when a majority of the justices currently comprising this court hold the opinion that the death penalty statute is unconstitutional, yet that penalty is imposed on the defendant because of adherence to an inapplicable legal doctrine.

Even if there were no constitutional difficulty with the use of the Illinois death penalty statute, I believe that a serious error occurred during the guilt phase of the proceeding which requires a new trial. Defense counsel sought to discredit the identification testimony of David Toliver by establishing, on cross-examination, that the State granted him a specific favor by not charging him with a Class X offense which the circumstances of his crime warranted, in exchange for testifying against defendant. Toliver had already admitted that he had been convicted earlier for burglary, theft and forgery and had four theft charges and a burglary charge pending against him at the time of trial, and while he denied that he received any consideration from the State for his testimony, he indicated, on direct examination, that he thought his testimony "might help [his own] case out." The trial court prevented the defense from pursuing its inquiry, which was aimed at showing that Toliver was armed while committing a burglary and was therefore a candidate for a charge of armed violence (Ill.

Rev. Stat. 1979, ch. 38, par. 33A–2). The majority, in affirming this ruling, cites the various admissions Toliver had already made and concludes that the information sought by the defense would have been cumulative or of no effect.

The basic interest protected by the sixth amendment right of confrontation (U.S. Const., amend. VI; see Ill. Const. 1970, art. I, sec. 8) is the right to cross-examine adverse witnesses to determine the truth of what they assert or to ascertain their bias, motive or interest in testifying. (*Davis v. Alaska* (1974), 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 353-54, 94 S. Ct. 1105, 1110; *Burr v. Sullivan* (9th Cir. 1980), 618 F.2d 583, 586; *People v. Barr* (1972), 51 Ill. 2d 50, 51-52; *People v. Andrae* (1920), 295 Ill. 445, 460.) The courts of this State have consistently held, even in cases which do not involve the death penalty, that a criminal defendant should be given wide latitude in developing this kind of evidence. (*E.g., People v. Wilkerson* (1981), 87 Ill. 2d 151, 156; *People v. Barr* (1972), 51 Ill. 2d 50, 51-52; *People v. Mason* (1963), 28 Ill. 2d 396, 403.) Although this maxim is not entirely consistent with the " 'general rule' " cited by the majority that " ' "*** the latitude to be allowed in cross-examination of witnesses rests largely in the discretion of the trial court ***" ' " (*People v. Kline* (1982), 92 Ill. 2d 490, 504, quoting *People v. Gallo* (1973), 54 Ill. 2d 343, 356), both *Kline* and *Gallo* involved bench trials, unlike the instant case, which was tried before a jury. Moreover, in *Kline,* the only case mentioned by the majority, the court prefaced its discussion of the issue by "not[ing] initially that this was a bench trial" (*People v. Kline* (1982), 92 Ill. 2d 490, 504). Whereas, in bench trials, a judge might be within his discretion in deciding in advance that certain lines of cross-examination will not be fruitful or will unduly embarrass the witness, the rule in cases where a jury is the trier of fact should be as set forth in *People v. Wilkerson* (1981), 87 Ill. 2d 151, 156, a case very similar to the one at bar: "Defense counsel

should [be] allowed to present the theory that the witness was not credible because [he] was being rewarded for [his] testimony, and should [be] allowed to expose to the jury the underlying charges so that the jurors could consider their effect, if any, on the reliability of the witness."

Toliver's credibility was vital to the outcome of the trial because he was the principal witness for the prosecution, in a case with little physical evidence and no eyewitnesses: he not only testified that the defendant told him he had murdered George Kallai but identified a voice on a tape recording of the confession as being that of the defendant. I am not persuaded by the majority's view that the evidence to be adduced on cross-examination was merely corroborative of evidence that was already in the record. Even if there were reasons for ignoring in some cases the holding of *People v. Wilkerson* that "a court may not exclude otherwise admissible impeachment because it feels that the witness has already been sufficiently impeached" (87 Ill. 2d 151, 158), this should not be a case where this is done because the other "impeaching" evidence that was submitted to the jury was of a general and inconclusive nature and was contradicted by Toliver's assertion that he had received no consideration from the State in exchange for his testimony. Had this been augmented by evidence of a specific way in which Toliver might have received consideration for testifying against the defendant, the jury might well have chosen not to believe his testimony, a decision which it did not make on the basis of the insubstantial evidence of self-interest with which it had been presented. I cannot conclude that the defendant's inability to develop evidence that Toliver was a candidate for an armed-violence charge was harmless beyond a reasonable doubt, and would therefore reverse the conviction and remand for a new trial.