(Nos. 63144, 63149 cons.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DAVID THOMAS, Appellant.—THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. TYRONE PATTERSON, Appellant.

*Opinion filed April 16, 1987.*

GOLDENHERSH, J., took no part.

Steven Clark, Deputy Defender, and Elizabeth Clarke, Assistant Appellate Defender, of Chicago, for appellant David Thomas.

Jack J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant Tyrone Patterson.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., and Timothy W. Heath, Assistant State's Attorneys, of counsel), for the People.

JUSTICE MORAN delivered the opinion of the court:

A Cook County grand jury indicted the defendants, David Thomas and Tyrone Patterson, and a third individual, Juan McCune, charging each with two counts of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1), 9—1(a)(2)) and one count of armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2) for the murder of James Kevin Jackson. Prior to trial, McCune agreed to testify on behalf of the State. The State, in return, agreed to dismiss

the murder charges pending against him and not to contest a plea of guilty to concealment of a homicidal death. After a joint trial, the jury found both defendants guilty of murder. The trial court sentenced Thomas to 28 years' imprisonment and Patterson to 24 years. The appellate court affirmed both defendants' convictions and sentences. (140 Ill. App. 3d 421.) We allowed the defendants' petitions for leave to appeal under Rule 315 (103 Ill. 2d R. 315).

The issues presented for review are: (1) whether the trial court erred in admitting Patterson's uncounseled post-indictment statements to the police and an assistant State's Attorney, and (2) whether the trial court erred in denying Thomas' motion for severance.

On August 21, 1983, at approximately 3 a.m., the defendants and Carl Harmon, all of whom were members of the Vice Lords street gang, and McCune, who belonged to a gang aligned with the Vice Lords, were walking toward the 1623 Club in Evanston. When they arrived, they saw several members of a rival gang, the Black Mobsters, and a fight broke out. After the fight, they ran to Thomas' house. At trial, McCune testified that approximately 10 minutes after they arrived, Jackson, a member of the Black Mobsters, drove past Thomas' house and stopped. Jackson then backed up and stopped near Thomas' house. Words were exchanged, and Thomas punched Jackson in the jaw, opened the driver's door and began hitting Jackson. McCune testified that he ran to the car and started to hit Jackson, while Patterson was in the back seat of the car also hitting Jackson. Harmon pulled Jackson out the passenger side of the car. The defendants kicked and beat Jackson about his head and body as he lay beside the curb. McCune also testified that Patterson struck Jackson with his shoe two or three times, Thomas and Harmon had each kicked and hit Jackson about 10 times and Harmon

had "jumped on his head." Patterson and Harmon then lifted Jackson and put him face down into the back seat of the car with them. Thomas sat in the front passenger seat while McCune drove the car approximately 1½ blocks north through a park to a dead end.

When they arrived, Patterson and Harmon pushed Jackson out of the car. Harmon dragged Jackson, striking and hitting him, and threw him face down into a puddle of water. Thomas then suggested that they throw Jackson over the fence into a canal. Harmon instructed McCune to go get a knife, and Patterson told him to go get the knife he had left at Patterson's house earlier. McCune drove away and did not return to the scene of the murder. Police found Jackson's body later that morning.

At approximately 4 o'clock that afternoon, Evanston police arrested McCune pursuant to a warrant for battery and mob action in connection with the fight that occurred near the 1623 Club. Patterson and Thomas were also subjects of the same arrest warrant. While he was in custody, McCune waived his *Miranda* rights and gave a statement regarding the fight near the 1623 Club. McCune was also questioned about the killing of Jackson and gave a statement implicating Patterson, Thomas, Harmon and himself.

Patterson was arrested pursuant to the warrant at about 7 p.m. that evening. He waived his *Miranda* rights and gave a statement concerning the fight near the 1623 Club. Officer Michael Gresham then questioned Patterson concerning the killing of Jackson. Patterson indicated that he knew nothing about it. Police arrested Thomas at about 11 p.m. that night pursuant to the warrant on which they had arrested McCune and Patterson.

The next day, Assistant State's Attorney Robert Friedman interviewed Thomas. He informed Thomas that he was assisting the police in the investigation of

the homicide of Jackson and was not there to represent him. After Friedman advised him of his *Miranda* rights, Thomas stated he wished to give a statement. Thomas indicated that the police had treated him fairly while he was in custody. Friedman told Thomas that a witness, Nancy Adams, told police that she had seen him and three other people beating someone on the street in Evanston. He also told Thomas that McCune had given the police a statement placing both himself and Thomas at the canal where police found Jackson's body and describing what had happened there. Friedman then told Thomas that, according to McCune's statement, Thomas remained with the victim at the scene when he left the area. Thomas responded that that was true. When Friedman asked whether McCune had left the area by himself, however, Thomas indicated that he did not wish to answer any further questions and requested counsel. Friedman immediately terminated the interview and proceeded to leave the room. As he approached the door, however, Thomas said: "You know the police took my shoes and prints, but they won't find anything because I wasn't where the body was found." Later that day, McCune gave Friedman a statement which, again, implicated the defendants, Harmon and himself. That evening, police advised Patterson that he had been implicated in a murder and that "charges were either approved or [that the police were] seeking charges at that time."

On August 23, a Cook County grand jury indicted the defendants and McCune for Jackson's murder. Officer Gresham removed Patterson from the lockup to process and transfer him to Cook County jail. When Gresham told Patterson that he had been indicted, Patterson asked how many people had been indicted. Gresham informed Patterson that Thomas and McCune had also been indicted. Patterson then asked why Harmon had

not been indicted and told Gresham that "Harmon did everything." Patterson also told Gresham that Harmon said he had told a neighbor that he had killed somebody. At that point, Gresham stopped Patterson and gave him a *Miranda* waiver form. Gresham read the warnings aloud as Patterson read along with him. After Patterson initialed each warning and signed the waiver, he described how Jackson was attacked and pulled from his car. He admitted having struck the victim several times with his fist and with the victim's shoe during the initial beating that occurred near his house. He told Gresham that McCune and Harmon put Jackson back into his car. Jackson was then driven to the dead end and dragged from his car. He further stated that, after McCune left the dead end, Harmon beat Jackson about the head and face with clay boulders and threw him into a mud puddle.

Later that day, Assistant State's Attorney George Smith, of the felony-review unit, also interviewed Patterson. Patterson verified that he had signed and initialed the *Miranda* waiver form that Gresham had given him. He indicated that he understood his rights. Smith again advised Patterson of his *Miranda* rights and explained that he was assisting the police in the investigation of a murder and that he was not representing Patterson. Patterson indicated that he understood. He said that he had been treated well by the police, had been fed and had rested. He also told Smith that he was making the statement of his own free will and without having been threatened or promised anything. Patterson then gave Smith a detailed account of Jackson's murder.

Before trial, Patterson moved to suppress his statements and Thomas moved to sever his trial from Patterson's. The court denied both motions but later granted Thomas' motion *in limine*, instructing the State to refrain from using Thomas' name when introducing

Patterson's statements and to eliminate all references to Thomas' being in the victim's car.

At trial, Officer Gresham testified regarding Patterson's arrest. He further testified concerning the statement that Patterson made after learning that he had been indicted. Assistant State's Attorney Smith also testified concerning Patterson's statement. Smith's testimony essentially corroborated Gresham's. In addition, Smith testified that Patterson told him that Harmon instructed McCune to go get a knife. Patterson recalled telling Harmon and McCune that there was a knife at his house. He told Smith that McCune then drove Jackson's car away from the scene. Smith also testified that Patterson stated that he and Harmon then fled the scene together and Thomas ran off in a different direction. Thomas objected to Smith's testimony that Thomas was at the scene and fled. The court sustained his objection and instructed the jury to disregard the testimony insofar as it concerned Thomas.

Patterson neither testified nor presented any evidence at trial. Thomas, however, testified in his own defense. He admitted that he punched Jackson in the jaw once but denied participating in the beating that occurred near his house, getting into the victim's car and riding to the dead end. He testified that he stood on the sidewalk in front of his house and watched Jackson's car drive toward the dead end and stop. Thomas also testified that he then walked to the area where Jackson's car was parked, but stopped approximately 25 feet from the others. He testified that he saw Harmon "making downward motions *** with his hands," but was unable to determine whether Harmon had an object in his hands. Finally, Thomas testified that he did not help, encourage or even say anything while he stood there.

Defendant Patterson contends that neither the admonitions required by *Miranda* under the fifth amendment

nor his knowledge of the fact that he had been indicted for Jackson's murder afforded him sufficient information to knowingly and intelligently waive his sixth amendment right to counsel. Patterson also contends that this information was insufficient to enable him to knowingly and intelligently waive the right to counsel guaranteed by our State constitution (Ill. Const. 1970, art. I, sec. 8). Consequently, he maintains that his uncounseled post-indictment statements to Officer Gresham and Assistant State's Attorney Smith were obtained in violation of both his sixth amendment right to counsel and his right to counsel guaranteed by our State constitution.

Patterson correctly observes that the sixth amendment right to counsel and the right to have counsel present during interrogation, which is guaranteed by *Miranda* to safeguard the accused's fifth amendment privilege against self-incrimination, are separate and distinct rights. (*People v. Martin* (1984), 102 Ill. 2d 412, 419, *cert. denied* (1984), 469 U.S. 935, 83 L. Ed. 2d 270, 105 S. Ct. 334.) Consequently, he contends that *Miranda* warnings, which were fashioned to protect the accused's fifth amendment privilege, do not serve to create a sufficiently meaningful comprehension of the sixth amendment right to counsel. Absent such comprehension of all the facts necessary to an understanding of the sixth amendment right to counsel, he concludes that he could not have knowingly waived that right. Patterson urges this court to hold that the State must satisfy a higher burden to establish a knowing and intelligent waiver of the sixth amendment right to counsel than is necessary to establish a waiver of the right to counsel guaranteed by *Miranda*. This court recently rejected this argument in *People v. Owens* (1984), 102 Ill. 2d 88, *cert. denied* (1984), 469 U.S. 963, 83 L. Ed. 2d 297, 105 S. Ct. 361.

The defendant in *Owens* argued that a higher standard of waiver applies to the waiver of the sixth amend-

ment right to counsel. This court first noted that the Supreme Court has expressly reserved ruling on the question of whether waivers of the sixth amendment right to counsel must be judged by a higher standard than that which is applicable to waivers of the right to counsel under *Miranda*. (*People v. Owens* (1984), 102 Ill. 2d 88, 102.) The Supreme Court again reserved ruling on this question last term. (See *Michigan v. Jackson* (1986), 475 U.S. 625, 635-36 n.10, 89 L. Ed. 2d 631, 642 n.10, 106 S. Ct. 1404, 1411 n.10.) The lower courts that have addressed this issue are not in agreement. See *People v. Owens* (1984), 102 Ill. 2d 88, 102; see also 1 W. LaFave & J. Israel, Criminal Procedure sec. 6.4(f), at 472 (1984).

In *Owens*, the defendant was advised of his *Miranda* rights and signed a waiver of those rights prior to interrogation. Nevertheless, he argued that he could not have validly waived his sixth amendment right without knowledge of the fact that a criminal complaint charging him with murder had been filed. The court found that the defendant knew he was being held for questioning in connection with a murder. In concluding that the defendant validly waived his sixth amendment right to counsel, the court stated:

"[H]e was aware of the severity of the situation facing him and, since he had been given his *Miranda* warnings, he knew he had the right to have an attorney present during questioning. Considering these facts, together with defendant's familiarity with the *Miranda* warnings, we have no doubt of the admissibility of the statements ***." *People v. Owens* (1984), 102 Ill. 2d 88, 102-03.

Like the defendant in *Owens*, Patterson was aware of the gravity of his situation. After he was arrested on battery and mob-action charges, he was questioned concerning a murder. The record establishes that Patterson was informed of the fact that he had been indicted for

murder before he gave his statements to Officer Gresham and Assistant State's Attorney Smith. Smith explained his role as an assistant State's Attorney by informing Patterson that he was not representing Patterson, but was assisting the police in a murder investigation. Patterson indicated that he understood.

We also believe that Patterson, like the defendant in *Owens*, understood his constitutional rights before he gave his statements. The record reveals that when Patterson began to talk to Officer Gresham, Gresham stopped him and gave him a *Miranda* waiver form. Thus, before he gave his statement to Gresham, Patterson was informed that he had the right to remain silent and that if he chose to forgo that right, anything he said could and would be used against him in court. He was also informed that he had a right to have an attorney present during questioning. Before Assistant State's Attorney Smith interviewed Patterson, Patterson verified his signature and initials on the *Miranda* waiver form. Smith then advised Patterson of his *Miranda* rights again. Patterson indicated that he understood his rights and had no questions regarding them. We therefore conclude that, like the defendant in *Owens*, Patterson was aware of the gravity of his situation and that he understood his constitutional rights before he gave his statements to Officer Gresham and to Assistant State's Attorney Smith. He therefore knowingly and intelligently waived his sixth amendment right to counsel.

We next address Thomas' argument that the trial court erred in denying his motion for severance. A defendant may request a severance if he believes that joinder of his case with that of a codefendant will result in prejudice. (Ill. Rev. Stat. 1985, ch. 38, par. 114—8.) In *People v. Bean* (1985), 109 Ill. 2d 80, 92, this court stated that "[a] defendant does not have an automatic right in Illinois to be tried separately from his codefend-

ants simply because they were all charged in the same indictment for crimes arising from the same circumstances." Rather, defendants who are jointly indicted are to be jointly tried unless a separate trial is necessary to avoid prejudice to one of the defendants. (*People v. Olinger* (1986), 112 Ill. 2d 324, 345.) The decision whether to grant a separate trial is within the sound discretion of the trial court and will not be reversed absent an abuse of that discretion. *People v. Lee* (1981), 87 Ill. 2d 182, 186.

This court has recognized that prejudice may occur where a codefendant makes extrajudicial hearsay admissions that inculpate the defendant. (*People v. Olinger* (1986), 112 Ill. 2d 324, 345; *People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) The defendant may be denied his sixth amendment right to confrontation if the codefendant's hearsay admission is admitted against him and the codefendant does not testify. (*People v. Daugherty* (1984), 102 Ill. 2d 533, 541.) "Because the defendant cannot call the codefendant to the stand for cross-examination, either a separate trial should be ordered or the admission should be redacted to eliminate any references to the defendant." (*People v. Lee* (1981), 87 Ill. 2d 182, 187; see also *Bruton v. United States* (1968), 391 U.S. 123, 134 n.10, 20 L. Ed. 2d 476, 484 n.10, 88 S. Ct. 1620, 1626-27 n.10; *People v. Clark* (1959), 17 Ill. 2d 486, 490.) In *Bruton*, the Supreme Court held that the confrontation clause is violated where there is a "substantial risk" that a jury, despite limiting instructions, looked to a nontestifying codefendant's extrajudicial statements in assessing the defendant's guilt. 391 U.S. 123, 126, 20 L. Ed. 2d 476, 479, 88 S. Ct. 1620, 1622.

Thomas maintains that he was prejudiced by the testimony of Officer Gresham and Assistant State's Attorney Smith concerning Patterson's statements. He argues that Patterson's statements, viewed in the context of the

other evidence in this case, implicated him by implying that he was present at the scene of the murder. In support of his motion for severance, Thomas argued that, contrary to his own statement, Patterson's statements would place him in Jackson's car and at the scene where his body was found. Thomas' counsel admitted that Patterson's statement did not, however, indicate that Thomas struck Jackson while he was at the dead end. After reviewing summaries of both defendants' oral statements, the court noted that Thomas, by his own statement, implicitly placed himself at the scene when he told Assistant State's Attorney Friedman that McCune drove away from the park alone. Therefore, the court denied the motion for severance. As stated earlier, however, the court granted Thomas' motion in limine and instructed the State to refrain from using Thomas' name when introducing Patterson's statements and to eliminate all references to Thomas' being in the victim's car.

Contrary to the court's ruling, however, Assistant State's Attorney Smith testified that Patterson told him that "Thomas ran off" from the scene of the murder. As noted earlier, the court immediately sustained Thomas' objection and instructed the jury to disregard the reference to Thomas. Smith's testimony placed Thomas at the murder scene. Nevertheless, we do not find that it prejudiced Thomas. First, the State introduced testimony concerning Thomas' own statement in which he placed himself at the scene. Assistant State's Attorney Friedman testified concerning his interview of Thomas. He testified that he confronted Thomas with McCune's statement that Thomas was at the canal with the victim when McCune left the area. Friedman testified that Thomas responded that that was true. Patterson's statements did not otherwise implicate Thomas. In addition, the court instructed the jury: "Mere presence or negative acquies-

cence is not sufficient to make a person accountable for the acts of another."

Moreover, unlike the prosecutor in *Bruton*, the State presented other evidence of Thomas' guilt. McCune testified that Thomas hit and kicked Jackson approximately 10 times during the initial attack near Thomas' house. Lequita Adams, an ex-girlfriend of Thomas' who lived across the street from him, testified that she saw him throw the first punch at the driver of Jackson's car. Lequita Adams' mother, Nancy Adams, also identified Thomas and testified that he participated in the beating that occurred near his house. In addition, the State presented the testimony of Roger Shirk, a forensic scientist, that footprints found in the mud near Jackson's body could have been made by the shoes taken from Thomas shortly after he was arrested. Having reviewed the record, we find that Patterson's statements, as testified to by Officer Gresham and Assistant State's Attorney Smith, did not "add[ ] substantial, perhaps even critical, weight to the Government's case" against Thomas. (*Bruton v. United States* (1968), 391 U.S. 123, 127-28, 20 L. Ed. 2d 476, 480, 88 S. Ct. 1620, 1623.) We therefore conclude that the trial court did not abuse its discretion in denying Thomas' motion for severance.

The State filed a motion to strike Patterson's reply brief insofar as it alleges that his trial counsel was incompetent, or in the alternative, for leave to file a response thereto. The State was granted leave to file a response, and the motion to strike was taken with the case. In support of its motion to strike, the State argues that Patterson first asserted that his trial counsel was incompetent in his reply brief in the appellate court. The appellate court did not address this issue.

As he did in the appellate court, Patterson first raised the question of his trial counsel's competence in this court in his reply brief. Our Rule 341(e), which sets

forth detailed and comprehensive instructions concerning the contents of the appellant's brief, applies to criminal as well as civil appeals. (103 Ill. 2d R. 341(e); 87 Ill. 2d R. 612(i).) Rule 341(e)(7) expressly provides: "Points not argued are waived and shall not be raised in the reply brief." (103 Ill. 2d R. 341(e)(7).) Similarly, this court has held that an argument not raised in the initial brief is deemed waived for purposes of review. *Murdy v. Edgar* (1984), 103 Ill. 2d 384, 393.

Nonetheless, Patterson's counsel seeks to circumvent the rules and holdings of this court, contending that the issue of counsel's effectiveness is a proper matter for a reply brief. He relies on *People v. George* (1986), 140 Ill. App. 3d 1001, 1005, and *People v. Maxwell* (1980), 89 Ill. App. 3d 1101, 1104, as authority for his position. Our Rule 341(g), however, clearly and specifically states: "The reply brief, if any, shall be confined strictly to replying to arguments presented in the brief of the appellee." (103 Ill. 2d R. 341(g).) Patterson's counsel's attempt to advance for the first time in this court the new issue of trial counsel's competence in the guise of a response to the State's waiver argument is in direct violation of this court's Rules 341(e)(7) and 341(g). We strongly disapprove of counsel's deliberate disregard for and attempt to circumvent this court's rules.

For the foregoing reasons, the State's motion to strike portions of Patterson's reply brief, which was taken with the case, is allowed; in cause No. 63144, the judgment of the appellate court is affirmed; and in cause No. 63149, the judgment of the appellate court is affirmed.

*Motion allowed;*
*judgments affirmed.*

JUSTICE GOLDENHERSH took no part in the consideration or decision of this case.