THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL DRAHEIM, Defendant-Appellant.

Second District    No. 2—91—0630

Opinion filed March 4, 1993.

Peter B. Nolte, of Rockford, for appellant.

Roger T. Russell, State's Attorney, of Belvidere, and Ruth Stern Geis, of Chicago (William L. Browers and John X. Breslin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

A jury convicted defendant, Michael Draheim, of one count of unlawful delivery of a controlled substance in an amount more than 1 gram, but not more than 15 grams in violation of section 401(b)(2) of the Controlled Substances Act (Ill. Rev. Stat. 1989, ch. 56½, par. 1401(b)(2)). He was sentenced to a term of six years with the Department of Corrections and fined $2,250. Defendant presented an entrapment defense and asserts on appeal that (1) the State failed to prove beyond a reasonable doubt that he was not entrapped, (2) he was denied his sixth amendment right to confront witnesses when the trial court refused to allow defense counsel to inquire as to monies paid to the informant and how many other drug deals she had set up, (3) the State's comments as to defendant's character during closing argument exceeded the bounds of propriety and denied defendant a fair trial, and (4) the defendant's sentence must be vacated and the cause remanded for resentencing where, he alleges, the trial court considered that, absent a statement of guilt by the defendant, a sentence other than one involving incarceration would not be imposed. We affirm.

Wendy Schindler was a confidential source for the Illinois State Police Department of Criminal Investigation (DCI) and testified for the State. According to the record, she became an informant because she had been a drug dealer herself, realized what happened to her, and did not want Michael Draheim to "die as a drug dealer." She sold drugs from May 1988 through November 1988 to support her habit and, according to the witness, quit using drugs in February 1989. She resided in Belvidere and had worked at the Chrysler Assembly Plant in Belvidere for approximately 12½ years. She had known the defendant, Michael Draheim, for years.

Wendy was referred to the DCI by a police officer that she had been in contact with regarding a battery charge for which she was the victim. According to the record, she began working as an inform-

ant in April 1989 "because [she] wanted to give a little bit back to the community and to where [she] worked to try to make it a better place to live." She had never been arrested at any time for selling or dealing cocaine. There were no pending charges that she knew of that prompted her to work with DCI as an informant.

Schindler testified that she had phoned the defendant between noon and 1 p.m. on February 7, 1990, and asked if he would sell her and her friend, Karen Lowrey, one-eighth of an ounce of cocaine. Defendant responded that he only had one-sixteenth of an ounce but he would try to get more. He indicated that he would sell one-sixteenth of an ounce for the sum of $100, and Schindler then suggested that they all meet at Grandpa's Restaurant parking lot at approximately 3 p.m.

After that phone conversation, the record reveals, Schindler testified that she contacted her "source" with DCI, Officer Berry, and told Officer Berry of the phone conversation that she had with the defendant. She then met Inspector Karen Lowrey, Sergeant Joe Rollins, and Officer Leon Berry at approximately 3 p.m. at the Oxford Inn parking lot. There, she and her vehicle were searched. Lowrey was currently employed by the Freeport police department and had been so for the past 25 months. For the previous 12 months Lowrey had been assigned to the Illinois State Police Narcotics Task Force. After the searches, Schindler and Lowrey drove to Grandpa's Restaurant parking lot in Belvidere. They arrived at approximately 3:15 p.m. and waited there for defendant, who pulled into the lot in a blue pickup truck. According to the record, she and Lowrey got out of her car, walked over to defendant's truck, and the defendant said, "get in." The defendant was sitting in the truck and had an approximately three-year-old girl sitting on the seat next to him. Schindler testified that she got into the truck and Lowrey stood outside the truck for a "couple of minutes" and then Lowrey returned to Schindler's car.

The defendant asked whether she had the money. Schindler called Lowrey over to the passenger side of the truck, telling the defendant that Lowrey had the money. Lowrey asked defendant how much it was, to which defendant replied $100. Defendant then took out a baggy containing what later was revealed to be cocaine and gave it to Lowrey by reaching over the little girl and Schindler. Schindler testified that Lowrey then handed the defendant $100 and watched him count the money. Defendant stated that he might be able to get one-sixteenth of an ounce later on.

Schindler testified that she had made only one telephone call to the defendant prior to or on February 7, 1990, in order to set up the

cocaine purchase from defendant. She admitted that she was alone when she made the call to defendant and that the phone call was not monitored in any manner. Furthermore, the only information Officer Berry had concerning the call was what Schindler told him. Schindler stated that, as far as she knew, defendant had never seen Lowrey before. Despite this, defendant gave Lowrey the cocaine on February 7, 1990, rather than giving it to Schindler, whom he did know.

Schindler admitted that she had sold drugs to other Chrysler Corporation employees. In fact, she sold drugs to anyone who would purchase from her. Schindler also testified that she was acquainted with Darrell Hubbard, who, when she was seeing him in 1987, 1988, and 1989, was a cocaine dealer. Schindler testified that if she was out of cocaine she would get it from Darrell for free.

Schindler testified that she received $40 for each transaction that she set up for DCI, but the court sustained objections by the State when defense counsel asked the witness how many people she had set up, how many times she had been paid $40, and whether she had ever set up her friend Darrell Hubbard. Schindler testified that she saw defendant many times at Chrysler Corporation and she did, on many occasions, ask him to sell her cocaine. She admitted to calling the defendant once on the telephone between the February 7, 1990, transaction and March 2, 1990, in order to induce him to sell her more cocaine. On March 2, 1990, Schindler called defendant again to ask him to sell her cocaine, and they agreed to meet later that day. Ultimately, she and Karen Lowrey met the defendant at the Chrysler Corporation parking lot at approximately 3:15 p.m. There, defendant gave Schindler two baggies containing cocaine and received $200 from Lowrey. Lowrey then asked defendant whether they could purchase one ounce. Defendant said that he would see what he could do and would get in contact with Schindler. Schindler also testified that following the March 2, 1990, incident she asked the defendant on several occasions to sell her even greater quantities of cocaine, but he refused.

Lowrey then testified. Lowrey's testimony regarding the events of the February 7, 1990, and March 2, 1990, transactions with defendant corroborated Schindler's testimony as to the aspects of the transaction for which Lowrey was present. Lowrey identified defendant's exhibit No. 2 as a report she wrote on February 7, 1990, regarding the details of the transaction at Grandpa's Restaurant parking lot. She admitted that in the report she indicated that she never exited Schindler's vehicle. Furthermore, she admitted that the report stated that Schindler exited the vehicle and walked to defendant's truck, and

then Schindler and defendant walked back to Schindler's car, where Lowrey had remained.

Following this testimony, the State rested and the defendant's motion for directed verdict, based upon the defense of entrapment, was denied. Defendant was then called as a witness on his own behalf. Defendant testified that he had lived his entire life in Belvidere and presently lived there with his girlfriend and her daughter. He stated that he had been employed by Chrysler Corporation for approximately 20 years. He testified that he had known Schindler and other members of her family for over 20 years, saw her from time to time in Belvidere, and considered her a friend.

Defendant testified that in 1988 he began using cocaine and used it once or twice a week, or sometimes not at all. When he started using cocaine he purchased it from Schindler because the two would often meet at Grandpa's Restaurant after getting off work at Chrysler. It was Schindler who initiated the first conversation regarding cocaine by telling defendant that she could get it for him if he wanted it. During 1988 and 1989, he purchased it approximately 12 times from her. During 1988 she introduced defendant to her friend Darrell. She identified Darrell as her source of cocaine.

Defendant testified that, during the month of January 1990, defendant had several telephone conversations with Schindler and saw her several times at work. In all of these conversations she asked him to purchase cocaine for her. He replied that he could not get it from anyone and that she should try to buy some from Darrell. He estimated that there were at least 15 to 20 telephone calls from Schindler and four or five occasions when she made the same request at the Chrysler Plant while both of them were at work. There were additional similar phone calls from Schindler to defendant in February 1990. According to the record, on several occasions she mentioned the fact that he "owed her a favor because she had gotten it for [him] before." He testified that he agreed to sell her one-sixteenth of an ounce on February 7, 1990, because he was tired of her pestering him. He got in touch with Darrell and purchased one-sixteenth of an ounce of cocaine from him for $100. He then met Schindler and Lowrey at the Grandpa's Restaurant parking lot on February 7, 1990, and exchanged the one-sixteenth of an ounce of cocaine for $100. Defendant testified that Lowrey never got out of Schindler's car.

Defendant testified that, following this incident, Schindler again called the defendant on numerous occasions asking him to purchase more cocaine for her. On March 2, 1990, he purchased two-sixteenths of an ounce from Darrell for the price of $200. He met Schindler and

Lowrey in the Chrysler parking lot and gave Schindler the cocaine in exchange for $200. After the exchange, he started walking toward the plant to go to work, and Lowrey said that she would need an ounce on Friday. Defendant did not respond. Schindler called defendant many other times following March 2, 1990, and requested more cocaine, but defendant refused.

Defendant testified that he never made any money on the transactions and only went through with the transactions because Schindler was a friend of his. He testified that he never sold cocaine to other people and had never been a drug dealer or cocaine seller of any kind. Following this testimony, the defense rested and defendant again moved for directed verdict. This motion was denied. The jury then deliberated and returned a verdict of guilty.

At defendant's sentencing hearing, following the denial of defendant's post-trial motion, the State called a witness named Charles Martin Arnold. Arnold was, at that time, incarcerated in the Boone County jail, serving a 364-day sentence for the offense of driving while his license was revoked. Arnold testified that, in the autumn of 1989, he approached a police officer for the purpose of making a "deal" with them in order to get his license back. He then became an informant for the DCI. Arnold also testified that he hoped to have his jail sentence reduced by virtue of his cooperation with police.

Arnold testified that on December 20, 1989, he drove to the defendant's home on Ipsen Road, accompanied by Agent Mosback. Arnold went into defendant's house, obtained one-eighth of an ounce of cocaine, and took it outside to the car where Agent Mosback was waiting. Agent Mosback then gave Arnold $250, which Arnold took to the defendant in the house.

Arnold also testified that he had purchased cocaine from defendant, accompanied by a person named Jim Maschke, two times in 1989. The first time was in August. After that, Arnold started working with the DCI. The second purchase was in December. When Arnold related to Agent Mosback that he had made a cocaine purchase without consulting the DCI in December, Agent Mosback told him never to do that again.

Agent Mosback testified that he accompanied Arnold to an address on Ipsen Road on December 20, 1989, and that at that time Arnold went into the house. He remained there a short time, less than a minute, and returned to the car with a plastic bag containing a white substance. Agent Mosback gave Arnold $250 which Arnold then took into the house. Mosback denied ever having been told by Arnold

that Arnold and Maschke had purchased drugs from defendant in December 1989.

Following the testimony of defendant's wife and defendant, the court sentenced defendant to a term of six years with the Department of Corrections. It also imposed a street-value fine of $250 and a further fine of $2,000.

Subsequently, the defense filed a motion for reconsideration of the sentence. At the initial hearing on that motion, the court asked the defendant if he would waive his right to be present at a conference between the court and both counsel in chambers. Defendant waived his right to be present at that conference. The court indicated that it did not believe defendant and thought that defendant was a drug dealer. The court then made the following statement which is at issue here:

> "So where are we at if he would admit that he was a pusher and he had engaged in this type of conduct? I would be willing to do other things, participate in programs other than a jail sentence. I don't know what the other alternatives and stuff to a prison incarceration. I don't know how you can approach him in that regard without him feeling like the Court is saying admit something you didn't do and he might reduce your sentence. I don't know where it puts it."

Jim Maschke then testified for defendant, and the substance of his testimony was that he never accompanied Arnold to defendant's house and never bought cocaine from defendant. Defendant then testified that Arnold had never been to his house to purchase cocaine and that on December 20, 1989, specifically, he did not see Charles Arnold at his house. He also testified that he hardly knew Arnold. Following this testimony the court declined to modify the sentence previously imposed. This appeal was timely filed.

On appeal, defendant's first contention is that the State failed to prove beyond a reasonable doubt that he was not entrapped. The entrapment defense is set forth in the Criminal Code of 1961 (Criminal Code):

> "Entrapment. A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated." (Ill. Rev. Stat. 1989, ch. 38, par. 7—12.)

Once the entrapment defense is raised, the burden is on the prosecution to `prove beyond a reasonable doubt that entrapment did not occur. *People v. Tipton* (1980), 78 Ill. 2d 477, 487; *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 773-74.

At the outset, we must address the proper standard of reviewing the sufficiency of the State's evidence against the entrapment defense. The question of whether a defendant has been unlawfully entrapped is a factual question to be decided by the trier of fact. (*Tipton*, 78 Ill. 2d at 487; *People v. Lambrecht* (1992), 231 Ill. App. 3d 426, 434.) A reviewing court may not substitute its judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of the witnesses. Furthermore, the reviewing court should not reverse a conviction unless the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. (*People v. Campbell* (1992), 146 Ill. 2d 363, 375.) Thus, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (*People v. Collins* (1985), 106 Ill. 2d 237, 261; see also *Campbell*, 146 Ill. 2d at 374.) Here, when the evidence is viewed under this standard, affirmance is warranted.

To support a finding of entrapment, the evidence must reveal (1) the State improperly induced the defendant to commit the crime, and (2) a lack of predisposition to commit the crime on the defendant's part. (*Lambrecht*, 231 Ill. App. 3d at 434; *People v. D'Angelo* (1992), 223 Ill. App. 3d 754, 774.) A defendant's predisposition to commit an offense is a critical element in overcoming an entrapment defense. (*People v. Cross* (1979), 77 Ill. 2d 396, 405, *cert. denied* (1980), 445 U.S. 929, 63 L. Ed. 2d 762, 100 S. Ct. 1316; *Lambrecht*, 231 Ill. App. 3d at 434.) Thus, in order to sustain its burden of proving that defendant was not entrapped, the State had to show that defendant was ready and willing to commit the crime without persuasion and therefore was predisposed to commit it. *Lambrecht*, 231 Ill. App. 3d at 434-35; *D'Angelo*, 223 Ill. App. 3d at 775.

There are several factors that courts consider when determining a defendant's predisposition to commit a crime: the defendant's initial reluctance or readiness to commit the offense, and, in the context of drug offenses, the defendant's familiarity with drugs, his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's own prior or current use of illicit drugs, whether he has a ready source to supply illicit drugs, and his participation in cutting or testing the drugs.

(*D'Angelo*, 223 Ill. App. 3d at 776; *People v. Schillaci* (1988), 171 Ill. App. 3d 510, 517-18.) It is also significant whether defendant was involved in a course of conduct which involved similar offenses. (*Lambrecht*, 231 Ill. App. 3d at 435; *People v. Beavers* (1986), 141 Ill. App. 3d 790, 795.) While a factor to be considered is whether defendant has a prior criminal record, that alone is not enough to show entrapment. (*Lambrecht*, 231 Ill. App. 3d at 435; *D'Angelo*, 223 Ill. App. 3d at 776.) We determine that, based on the evidence presented to it, the jury could have found beyond a reasonable doubt that defendant was predisposed to commit the offense of which he was charged.

■■ The evidence, when viewed in the light most favorable to the State, indicates that defendant was ready and willing to commit the offense. According to Schindler, on two of three occasions that she called defendant at home to solicit a sale of cocaine, February 7, 1990, and March 2, 1990, he met her within two or three hours of the call with the cocaine she requested. Thus, he was ready and willing to commit the offense.

Furthermore, on February 7, 1990, he showed an inclination to accommodate Schindler's and Lowrey's needs by stating that he would try to get them more cocaine later. He further showed a readiness to address their demands by stating on March 2, 1990, that he would try to work something out to get them a full ounce later on. Thus, he demonstrated a willingness to accommodate the drug user's needs.

In addition, defendant apparently had a ready source of cocaine: on February 7, 1990, when he agreed to sell Schindler one-eighth of an ounce, he merely called Darrell Hubbard to purchase the cocaine necessary for the exchange. As far as defendant's prior or current use of illicit drugs, the jury heard defendant's testimony that he used cocaine one to two times per week or sometimes not at all in 1988 and 1989.

Some of the State's evidence on the defendant's predisposition was contested by defendant. Most evident of that conflict was defendant's assertion that Schindler bothered him repeatedly by telephone calls and at work in the months of January and February 1990, in order to get him to sell cocaine to her. Nevertheless, where there are inconsistencies and conflicts in the evidence, it is up to the trier of fact to weigh the believability of the witnesses and resolve those inconsistencies. (*Lambrecht*, 231 Ill. App. 3d 426.) At trial, evidently the jury found the informant, Schindler, and Inspector Lowrey more believable than defendant.

Defendant contends that the facts of this case are like those of *People v. Fisher*, in which the court reversed the conviction, holding that defendant was entrapped. (*People v. Fisher* (1979), 74 Ill. App. 3d 330, 335.) We believe *Fisher* is distinguishable from the present case. In that case, the law enforcement officer's testimony did not preclude the possibility that he may have attempted to make purchases from the defendant prior to the occasion at which the transaction occurred. Furthermore, the State did not present any other evidence of predisposition. On that basis, the court determined that the State did not sustain its burden to show defendant's predisposition to commit the offense. Although in the present case Schindler made numerous attempts in person to purchase cocaine from defendant, thus likening this case to *Fisher*, there are other ways in which defendant's predisposition was revealed. In the present case, there was evidence of defendant's willingness to accommodate the drug user's needs. There was also evidence that defendant had a ready source of cocaine. There was also evidence that defendant had used cocaine in the past. Thus, there was other evidence of predisposition in this case which supported the determination that there was no entrapment and, therefore, distinguishes this case from *Fisher*. We believe that sufficient evidence, when taken in the light most favorable to the State, was introduced to prove beyond a reasonable doubt that defendant was predisposed to commit the charged offense and, therefore, was not entrapped.

The defendant next contends that he was denied his sixth amendment right to confront witnesses when the court refused to allow defense counsel to inquire as to the total amount of money paid to Schindler to date by the police and how many other drug deals she had set up.

The sixth amendment to the Federal Constitution protects the defendant's right of cross-examination (*Davis v. Alaska* (1974), 415 U.S. 308, 315-16, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110; *People v. Owens* (1984), 102 Ill. 2d 88, 103) and the Illinois Supreme Court has stated that defendants should be allowed a wide latitude to show bias. (*Owens*, 102 Ill. 2d at 103.) The scope of cross-examination rests mainly in the discretion of the trial court. *Owens*, 102 Ill. 2d at 103.

If trial error affects a Federal constitutional right, it is reversible error unless it is harmless beyond a reasonable doubt. (*Owens*, 102 Ill. 2d at 104; *People v. Perez* (1991), 209 Ill. App. 3d 457, 471.) In determining whether the error was harmless, the sufficiency of the evidence which proves guilt beyond a reasonable doubt must be considered. (*Perez*, 209 Ill. App. 3d at 471; *People v. Pizzi* (1981), 94 Ill.

App. 3d 415, 421.) We determine that while error occurred in this case, it was harmless error, and thus the judgment is affirmed.

Schindler was the State's main witness in this case. On direct examination and during her cross-examination it was revealed that she was working with the DCI to set up the drug transactions with defendant. On cross-examination, it was also revealed that she was paid $40 each time she set up a drug transaction for the police. Defense counsel was permitted to question her as to whether her police work was prompted by her fear that authorities would take her children from her. Defense counsel was also permitted to probe as to whether she had been assured that she would not be charged for her alleged criminal activities as long as she worked with the DCI. Defense counsel then asked how many people she had set up, how many times law enforcement personnel had given her $40, and whether she had occasion to set up her friend Darrell Hubbard. For each of those three questions, the State objected and the objection was sustained. Defendant argues that the refusal of the court to allow counsel to explore those areas for the purpose of showing bias, as well as the credibility of the witness, was reversible error.

Defendant relies on two cases to stand for the proposition that, in a case with facts similar to this one, the limitation by the court on the cross-examination of a witness was reversible error. (*People v. Perez*, 209 Ill. App. 3d at 472; *People v. Garrett* (1976), 44 Ill. App. 3d 429.) In *Perez*, defendant was convicted of delivery of a controlled substance and of calculated drug conspiracy. At trial defendant relied on the affirmative defense of entrapment. At issue was the cross-examination of the State's informant who was instrumental in setting up three drug transactions between defendant and a Drug Enforcement Agency (DEA) agent. While the defense was permitted to probe as to the fact that informant was paid by the DEA for setting up the transactions with defendant, defense counsel was not permitted to question informant about any arrests that were pending during the time of the three drug transactions. Defense counsel argued that the informant's arrest just prior to the first drug transaction and the later dismissal of those charges were relevant to the informant's bias and interest to testify against the defendant in that case. While the facts of *Perez* share some similarities with this case, that case is distinguishable in more than one way.

In the present case, the evidence of Schindler's bias in favor of the State was admitted. In contrast, in *Perez*, the evidence of bias based on the dismissal of the informant's arrest charges was kept out. Evidence of an arrest or charge with a crime is strong evidence of the

likelihood of bias or motive. (*People v. Triplett* (1985), 108 Ill. 2d 463, 475.) Furthermore, reducing the informant's credibility in *Perez* was crucial to the defendant's case, since the only witnesses to testify to the defendant's predisposition were the defendant and the informant. In contrast, in the present case, some of the evidence regarding defendant's predisposition to commit the crime was undisputed or Schindler's testimony was corroborated by Lowrey. For instance, defendant admitted himself that he had used cocaine repeatedly in 1988. Furthermore, both Schindler and Lowrey heard the defendant indicate that he would try to accommodate Schindler's and Lowrey's needs by trying to get them more cocaine later.

Furthermore, the *Perez* appellate court found the trial court's action to be in error, based on the record. That is, while the trial court did not permit defense counsel to question the information about his pending arrests, apparently defense counsel's remarks as to *why* he was posing the question were in the trial court record. (*Perez*, 209 Ill. App. 3d at 464.) It was that record upon which the appellate court based its decision. Thus, the *Perez* appellate court could reasonably draw the conclusion that there was a likelihood of bias on the part of the informant, even though questions regarding the pending arrest were never permitted to be answered. In the present case, there is no indication in the record that Schindler made a substantial amount of money serving as an informant. Thus, we cannot speculate as to facts that were not revealed by the record.

*Garrett* may be distinguished from the present case as well. (*Garrett*, 44 Ill. App. 3d at 438.) In that case, the defense was completely foreclosed from inquiring about the informant's financial relationship with the police, whether defendant's credibility could be destroyed by the introduction of evidence of hospital records which would reveal that she had taken drugs after a certain date, and whether defendant's mother had filed a complaint against the witness. In contrast, as discussed above, several inquiries were permitted in the present case, and Schindler's bias was exposed. Thus, whereas no bias was permitted to be revealed in the *Garrett* case, in the present case, bias was divulged.

■ Because such a wide latitude is permitted on cross-examination to demonstrate bias, this court determines that the trial court committed error by preventing defense counsel from exploring how much total money Schindler had made by setting up drug transactions for the DCI. Although bias had been revealed, the degree to which it existed was not revealed when the court prevented Schindler from stating how much total money she made as an informant. But because

bias was permitted to be demonstrated, and because some of the evidence regarding defendant's predisposition was undisputed or attested to by Schindler and by Lowrey, this court determines that the sufficiency of the evidence sustains guilt beyond a reasonable doubt and the error that occurred was harmless error.

Defendant posits that the State's comments during closing argument exceeded the bounds of propriety and denied the defendant a fair trial. At the conclusion of the State's rebuttal the State related to the jury:

> "In closing I just ask you to have an open mind and go over the facts of the case. You have heard them often enough. But one other thing that I am sure bothered the jury about the Defendant was the fact that he did bring the young girl along with him when he sold the cocaine the first time. Is that the type of person who you are going to believe here in Court?
>
> [Defense Counsel]: I think that's absolutely improper comment and I object to it, Judge.
>
> THE COURT: Objection overruled.
>
> [The State]: I pose that again, is that the type of person you would believe, a 3 year old girl [sic] in the middle of a drug deal? Thank you for your time and attention, ladies and gentlemen of the jury."

The character and scope of argument to the trier of fact are left largely to the trial court, and every reasonable presumption must be indulged in that the trial judge has performed his duty and properly exercised the discretion vested in him. (*People v. Smothers* (1973), 55 Ill. 2d 172, 176.) A prosecutor has the right to make legitimate comments on the evidence that are relevant to the guilt or innocence of the defendant, but a prosecutor is prohibited from making any comment that serves no purpose but to inflame the passions of the jury. (*People v. Tiller* (1982), 94 Ill. 2d 303, 321.) A prosecuting attorney has the right to draw all legitimate inferences that he is able to from the facts in evidence, and the accused cannot complain that such deductions place him in a bad light before the jury. (*People v. Heidman* (1957), 11 Ill. 2d 501, 511.) Thus the prosecutor may comment upon the conduct of the defendant, and denounce his wickedness, if such comment is based upon evidence competent and pertinent to the issues. (*Heidman*, 11 Ill. 2d at 511.) We determine that if error occurred in this case, it was harmless.

■ In the present case, defendant's credibility was at issue. When a defendant testifies, his credibility, like that of any other witness, is at issue. (*People v. Tinsley* (1970), 128 Ill. App. 2d 440, 445.)

While it is true that it was in evidence that defendant brought a three-year-old girl with him to the first drug transaction, it is not a reasonable inference from the evidence that that fact would directly relate to defendant's credibility. Despite this, it is apparent that defendant suffered no real prejudice here. The evidence that the child was brought by defendant to the drug deal was already heard by the jury. The discrepancies in defendant's and the State's witnesses' stories contributed substantially to the lack of defendant's credibility. Furthermore, the State's question was not so strong a statement as to inflame the passions of the jury. (See *Tiller*, 94 Ill. 2d 303 (where the prosecution characterized the defendant in a trial for three murders as lower than an animal as he killed them without reason and, also, the prosecution characterized the three murders as a holocaust, similar to the Nazi holocaust).) It would thus appear that substantial evidence was presented from which the jury could judge defendant's credibility and the error, if any, in permitting the State's questions during closing argument was harmless beyond a reasonable doubt. *People v. Owens* (1984), 102 Ill. 2d 88, 104.

Defendant next argues that the sentence should be vacated and the cause remanded for resentencing since, he alleges, the trial court indicated that, absent a statement of guilt by the defendant, a sentence other than one involving incarceration would not be imposed. All penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. (Ill. Const. 1970, art. I, §11; Ill. Rev. Stat. 1989, ch. 38, par. 1001—1—2(d).) Nevertheless, the trial judge's decisions in regard to sentencing are entitled to great deference and weight. (*People v. Streit* (1991), 142 Ill. 2d 13, 18-19.) Sentencing is a matter for the discretion of the trial court and must not be reversed absent a showing of abuse of that discretion. (*Streit*, 142 Ill. 2d at 19; *People v. Fetter* (1992), 227 Ill. App. 3d 1003, 1009.) Our review of this record reveals no abuse of discretion.

A defendant's punishment may not be increased because of his refusal to admit guilt following a conviction. (*People v. Sherman* (1977), 52 Ill. App. 3d 857, 859.) This is to protect an individual's right of appeal or prospects of post-conviction relief which might otherwise be jeopardized by the rewarding of defendant's admission of guilt following trial. (*People v. Speed* (1984), 129 Ill. App. 3d 348, 349, citing *Sherman*, 52 Ill. App. 3d at 859.) It is well established that the court may consider the lack of remorse in determining the appropriate sentence to be imposed upon a defendant, since this is a factor which may have a bearing on the defendant's potential for rehabilitation.

(*Speed,* 129 Ill. App. 3d at 349.) In addition, a sentencing judge may consider a defendant's lack of truthfulness on the witness stand, since this, too, may have a bearing on defendant's rehabilitative potential. *Speed,* 129 Ill. App. 3d at 349.

■ The transcript of the trial court's reasons for imposing sentence at the original sentencing hearing encompasses five pages of the transcript. The trial court first stated that it considered all the information available to it, the evidence received at trial, the presentence report, the evidence offered in aggravation and mitigation, and arguments as to sentencing alternatives. The trial court considered defendant's truthfulness as a relevant factor in sentencing. The court then indicated that it understood that defendant did not have to admit the offense but that he could consider that fact in sentencing. The court stated it had seriously considered probation but rejected that option because of the evidence of another sale that was introduced during the sentencing hearing. The trial court further stated that the seriousness of the offense and the necessity to deter others mandated a penitentiary sentence, and it sentenced defendant to a term of six years.

The record reveals that defendant filed a motion for reconsideration of sentence and, before hearing evidence or argument, the court suggested an in-chambers conference. Defendant waived his right to be present. In conference, the court indicated its disbelief as to defendant's testimony and the poor prospects for defendant's rehabilitation as long as he continued to deny his drug-dealing activities. It then stated the colloquy in issue, asking where would it be if defendant would admit his involvement in drug dealing. The court stated it would be willing to impose an alternative to prison incarceration.

Defendant asserts that a "fair" reading of those comments reveals that only if defendant abandoned his claim of innocence and admitted to the court he was a "[drug] pusher," would the court have been "willing to do other things, [such as] participate in programs other than a jail sentence." We disagree.

Defendant takes that colloquy out of the context of the entire sentencing process that took place in the trial court. In deciding whether to reverse a sentence imposed by the trial court, the reviewing court should not focus on a few words or statements of the trial court. Rather, the determination of whether a sentence was rendered properly must be made by considering the entire record as a whole. (*People v. Ward* (1986), 113 Ill. 2d 516, 526-27.) In the present case, we find that the trial judge evaluated the factors set out in the sentencing hearing guidelines in the Unified Code of Corrections. (Ill. Rev.

Stat. 1989, ch. 38, par. 1005—4—1.) Furthermore, immediately before making the comments at issue, the court explored the defendant's lack of rehabilitative potential as evidenced by the defendant's apparent lack of truthfulness on the witness stand and lack of remorse. On this basis, we determine that the trial court did not abuse its discretion with respect to sentencing.

The conviction and the sentence imposed by the trial court are affirmed.

Affirmed.

INGLIS, P.J., and GEIGER, J., concur.