THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DESI CHISM, Defendant-Appellant.

Second District   No. 2—91—1345

Opinion filed August 9, 1993.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Kathleen T. Zellner and Douglas H. Johnson, both of Kathleen T. Zellner & Associates, of Naperville, for appellant.

James E. Ryan, State's Attorney, of Wheaton, and Susan Davis Brunner, of Evanston (William L. Browers, Lisa A. Hoffman, and John X. Breslin, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

Following a bench trial in the circuit court of Du Page County, defendant, Desi Chism was convicted of unlawful delivery of more than 15 but less than 100 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(A) (West 1992)) and was sentenced to a term

of six years' imprisonment and fined $9,600. On appeal, defendant contends that his conviction must be reversed because the State failed to prove beyond a reasonable doubt that he was not entrapped.

The evidence adduced at trial was as follows. The State's principal witness was Larry Wiess, a police officer with the Du Page County sheriff's police assigned to the Du Page Metropolitan Enforcement Group (DuMEG). During his assignment to DuMEG, Wiess' duties consisted exclusively of investigating narcotics trafficking. Wiess testified that during the first week of January 1991, he received a call on his electronic pager. Wiess telephoned the number that appeared on the pager, and the telephone call was answered by an individual who identified himself as "Deacon." Wiess later learned that Deacon was defendant. Defendant stated that he was a friend of Marty and Corky and had obtained Wiess' telephone number from them. Marty was Martin Gomez, an individual who had previously agreed to act as an informant to Wiess. Corky was a mutual friend of defendant and Gomez. During this conversation, defendant asked Wiess to purchase cocaine from him, and during the next two weeks, Wiess and defendant had several conversations aimed at setting up a sale of a quarter kilogram of cocaine. Defendant wanted $10,000 for the cocaine and wanted the sale to take place at a location on the south side of Chicago. Wiess was unwilling to complete the transaction on the south side of Chicago, and the negotiations in January 1991 broke off.

Wiess had no further contact with defendant until late April 1991. During the week of April 22, Wiess received approximately five telephone calls from defendant. At first, defendant did not leave a telephone number where he could be reached, and Wiess did not return any of the calls until April 30, when Wiess called defendant at his home. Defendant asked Wiess why he did not return defendant's calls, and Wiess responded that he was able to obtain cocaine from another source without travelling to Chicago. Defendant indicated that he had a new source who could provide nine ounces a week and that Wiess would not have to drive to Chicago to purchase the narcotics. Wiess asked defendant to find out the price and to call him back. About half an hour later, defendant left a voice mail message for Wiess, indicating that he had paged his cocaine supplier and would provide Wiess with prices on the following day.

At about 10 a.m. on April 30, Wiess called defendant but defendant had not yet obtained a price for the cocaine. Later that day, at about 5:30 p.m., defendant paged Wiess and told him he could provide four ounces of cocaine that evening at a price of $1,300 an ounce.

Wiess responded that he would be working late, and defendant asked Wiess to call him when he got off of work. Wiess did not call again that evening, and the next day, May 1, at 12:25 p.m. defendant contacted Wiess, asking why Wiess had not called him the prior evening. Wiess responded that he got home from work late. Defendant asked if Wiess still wanted to go through with the transaction and Wiess said he did. Defendant indicated that he had previously been mistaken about the price for the cocaine, which was $1,350 per ounce rather than $1,300. Defendant further stated that he was not making any money on the transaction, and he wanted Wiess to provide him with an ounce of cannabis, fill up his car with gasoline and let him take some of the big rocks out of the cocaine bag. Wiess agreed to these requests.

About an hour later defendant again contacted Wiess and they agreed to meet at a Denny's restaurant in Willowbrook to complete the sale. Defendant was waiting for a friend to arrive and stated that he would page Wiess when the friend arrived. Wiess did not hear from defendant again until about 1:15 a.m. the next morning, May 2, when defendant again paged Wiess. Defendant stated that his friend failed to show up. Defendant further stated that he was going to call his nephew, who was his source, and would then contact Wiess again. That afternoon defendant contacted Wiess and indicated that his source had sold the four ounces being held for Wiess, but would be getting another four ounces at 6 or 7 p.m. Defendant indicated that he would page Wiess at that time. Apparently, however, there were no further conversations between Wiess and defendant on May 2. On May 3, at 9 p.m., Wiess telephoned defendant after defendant had paged him twice. Defendant stated that his source had the four ounces, but Wiess replied that he had obtained two ounces and was in no hurry to purchase four ounces from defendant. Defendant responded that if Wiess did not make the purchase, defendant's source would not do business with Wiess anymore. Wiess agreed to make the purchase the following day.

On May 4, three telephone conversations between defendant and Wiess took place in preparation for the sale at the Denny's in Willowbrook. In their last conversation that day, defendant indicated that his car had broken down near the expressway and that he would call back when it was running. Wiess did not hear from defendant again until May 6. Defendant indicated that his source wanted to complete the transaction on the previous day, but defendant did not want to bother Wiess because it was a Sunday. Defendant still wanted to sell Wiess the four ounces of cocaine and they agreed that defendant

would page Wiess and leave the number "666" on Wiess' electronic pager as a signal that defendant was on his way to the Denny's. After receiving the "666" code on his pager at about 4:20 p.m., Wiess proceeded to the Denny's and waited in his parked car for defendant, who had indicated that he would be travelling in a brown car. Subsequently a brown car arrived in which defendant was riding in the backseat, and two males were riding in the front seat. The car at first pulled into a space near where Wiess was parked, but then backed out of the space and drove around to the other side of the building, out of Wiess' sight. Defendant then approached Wiess' car and identified himself as "Deacon." Defendant climbed into the passenger side of Wiess' car and gave Wiess a clear plastic bag inside of which were four smaller bags containing a white powdery substance later identified as cocaine. Wiess complained that defendant had told him the cocaine would be "rock right off the brick," but that it appeared powdery. Defendant told Wiess to open the bag and check out the rocks inside. Wiess had defendant open one of the bags, and Wiess pulled out the money to buy the cocaine. Defendant stated that now that they had done business, he would be able to provide four ounces every week. At that point Wiess signalled to other police officers present at the scene who arrested defendant. As he was being arrested, defendant ripped open the bag he was holding and spilled the powdery contents onto the parking lot.

Wiess testified that he had known Martin Gomez for several months prior to January 1991, and had been involved in arresting Gomez in 1990 for the alleged delivery of a controlled substance. Subsequently, Wiess enlisted Gomez to act as an informant and introduce Wiess to narcotics sellers. Wiess was aware that Gomez had enlisted an individual named Corky to help him. Wiess had never met Corky, but had spoken with him by telephone.

Robert Guerrieri, Michael Cooke and William Simmons, all law enforcement officials assigned to DuMEG, observed the transaction in the Denny's parking lot from a mini van and arrested defendant after being signalled by Wiess. When the brown car in which defendant was riding pulled into the lot, Guerrieri observed the passenger in the front reach down toward the floorboard area and hand something to defendant, who was seated in the back. Simmons similarly testified that he observed the passenger in front, who he identified as James Lofton, reach over into the backseat.

Following his arrest, defendant was questioned by Agents Cooke and Simmons at the Willowbrook police department. When asked where he obtained the cocaine he delivered to Wiess, defendant stated

that he asked his cousin, Jeff Higgins, if he could obtain the cocaine. Higgins said he could get four ounces for defendant and he put defendant in touch with John Lofton, who likewise said he could provide defendant with the cocaine. Defendant, Higgins and Lofton drove out to the Denny's, and when they arrived, Lofton reached over the backseat and handed defendant the cocaine which he delivered to Wiess.

Defendant testified that on an occasion in January 1991, Lawrence Cortez, who was known as "Corky," was at defendant's house and had asked if he could make a few telephone calls. Corky dialed a number and handed the telephone to defendant indicating that Wiess was on the line. Defendant testified as follows regarding the ensuing conversation with Wiess:

> "He introduced himself as Larry, Marty's brother-in-law, and he told me that he had learned through Corky and Marty that I knew some people that might be able to help him out. And I said help him out? And he say [sic], you know, and he was talking about getting something for us. And I said what do you mean? He said have Corky and Marty talked to you about it? I told him I only met Marty one time, he asked me to do something about for him [sic], but I told him I really didn't have too much interest."

Defendant testified that Wiess asked defendant to provide him with narcotics. Defendant was not selling or in possession of narcotics at that time.

During the period between this conversation and May 6, 1991, defendant spoke with Wiess over 40 times. In the week following the first conversation, Wiess called defendant, leaving messages on defendant's answering machine which defendant didn't return. Defendant testified that he next spoke to Wiess in April. Wiess had apparently left a message for defendant and defendant returned the call. Defendant testified that Marty and Corky kept pestering him. They called at all times of the night and left messages when he was not home. When defendant tried to reach Wiess but was unsuccessful, the pressure continued. According to defendant, "Corky would come by, and Marty would call and leave messages, and about a week later I did call [Wiess]." During the conversation in April, Wiess indicated that he wanted a quarter "key," but defendant told him that he did not really use or sell drugs. Wiess responded that he knew defendant was out of work and that they could possibly come to some kind of agreement. Wiess stated that he understood that defendant did not like cocaine and offered him some cannabis. Defendant agreed to

"look into it." Defendant testified that Corky had provided him with the cocaine that he delivered to Wiess on May 6, 1991.

In his testimony during redirect examination, defendant indicated that during the period in question Marty and Corky made promises to defendant suggesting, in essence, that doing business with Wiess would offer defendant a solution to financial difficulties he was experiencing. Defendant stated that "[Marty and Corky] badgered me for months, and then when I needed the money and I still wouldn't get any drugs for them, they come and ask me, okay, well, you say you won't get him any drugs, how about dropping this off, and I needed the money, so I did."

Martin Gomez testified on behalf of the State as a rebuttal witness. Gomez admitted to a history of involvement with narcotics, including a prior conviction and pending charges in the circuit courts of Cook and Du Page Counties for unlawful delivery of a controlled substance. Following his arrest in connection with the charges in Du Page County, Gomez entered into an agreement with Agent Wiess, pursuant to which Gomez would supply Wiess' telephone numbers to persons who could deliver four or more ounces of cocaine. In exchange for his cooperation, it was agreed that Gomez's assistance to the police would be considered in connection with his pending charges in Du Page County. Gomez subsequently entered into a plea agreement with respect to those charges. The plea agreement did not require his testimony against defendant. Gomez testified that he approached Corky and asked him for help in supplying drug contacts for Agent Wiess. Gomez informed Corky that Wiess was an undercover police officer seeking to apprehend drug dealers. Gomez believed things would go badly for him if he did not supply Wiess with a drug dealer. Gomez admitted that he was using narcotics at the time of Wiess' initial contact with defendant in January 1991.

Gomez testified that he had only met defendant once, in mid-January 1991. During that meeting, defendant told Gomez that he heard Gomez was "looking for something." Gomez said he was trying to obtain "four O's, maybe a quarter." Defendant responded that it would be no problem. Gomez requested that the transaction take place in Aurora, and defendant stated that he knew the area. Gomez then gave defendant several of Agent Wiess' telephone numbers, telling defendant that either Gomez or his brother-in-law Larry would answer. After the conversation in January, Gomez did not again speak to defendant personally, but on one occasion near the beginning of April, Gomez left a message on defendant's answering machine indicating

that Gomez was still interested in doing the deal if defendant wanted to work.

Defendant contends that the evidence adduced at trial establishes the defense of entrapment, and his conviction must therefore be reversed. Section 7—12 of the Criminal Code of 1961 (720 ILCS 5/7—12 (West 1992)) provides:

> "A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated."

The defense of entrapment is an affirmative defense, and once a defendant presents some evidence to raise the issue of entrapment, the burden is on the State to prove beyond a reasonable doubt that the defendant was not entrapped. *People v. Tipton* (1980), 78 Ill. 2d 477, 487; *People v. Colano* (1992), 231 Ill. App. 3d 345, 348; *People v. Lambrecht* (1992), 231 Ill. App. 3d 426, 433.

Entrapment is established when governmental officials originate a criminal design, implant in the mind of an innocent person the disposition to commit the offense, and induce the commission of the offense in order to obtain evidence for use in prosecuting that person. (*People v. Martin* (1991), 219 Ill. App. 3d 1064, 1075.) To support a finding of entrapment, the evidence must reveal (1) the State improperly induced the defendant to commit the crime, and (2) a lack of predisposition to commit the crime on the defendant's part. (*People v. Draheim* (1993), 242 Ill. App. 3d 80, 88; *Lambrecht*, 231 Ill. App. 3d at 434.) A defendant's predisposition to commit an offense is a critical element in overcoming an entrapment defense, and in order to sustain its burden of proving that defendant was not entrapped, the State must show that the defendant was ready and willing to commit the crime without persuasion and therefore was predisposed to commit it. *Draheim*, 242 Ill. App. 3d at 88, *Lambrecht*, 231 Ill. App. 3d at 434-35; see also *Colano*, 231 Ill. App. 3d at 349.

In this court's recent decision in *People v. Draheim* (1993), 242 Ill. App. 3d 80, we discussed the principles applicable to the issue of predisposition in a narcotics prosecution:

> "There are several factors that courts consider when determining a defendant's predisposition to commit a crime: the defendant's initial reluctance or readiness to commit the of-

fense, and, in the context of drug offenses, the defendant's familiarity with drugs, his willingness to accommodate the needs of drug users, the defendant's willingness to make a profit from the illegal act, the defendant's own prior or current use of illicit drugs, whether he has a ready source to supply illicit drugs, and his participation in cutting or testing the drugs. [Citations.] It is also significant whether defendant was involved in a course of conduct which involved similar offenses. [Citations.] While a factor to be considered is whether defendant has a prior criminal record, that alone is not enough to show entrapment." *Draheim*, 242 Ill. App. 3d at 88-89.

See also *Colano*, 231 Ill. App. 3d at 349-50.

■ Before turning to the evidence in this case we must address an issue related to the standard of review applicable to the defense of entrapment. Citing *People v. Connor* (1988), 176 Ill. App. 3d 900, defendant contends that a reviewing court is to consider all of the defendant's testimony regarding an entrapment defense in a light most favorable to him. We recently rejected this standard of review in *People v. Colano* (1992), 231 Ill. App. 3d 345, and *People v. Lambrecht* (1992), 231 Ill. App. 3d 426. The proposition in *Connor* which defendant relies upon apparently originated in *People v. Husted* (1981), 97 Ill. App. 3d 160, which in turn purported to rely upon *People v. Carpentier* (1974), 20 Ill. App. 3d 1024. However, as we observed in *Colano* and *Lambrecht*, *Carpentier* dealt with the limited issue of whether the defendant was entitled to a jury instruction on the defense of entrapment and held that in this context the evidence was to be viewed in a light most favorable to the defendant. We declined to apply this standard to appellate review of whether the State has sustained its burden of proof on the issue of entrapment. (*Colano*, 231 Ill. App. 3d at 349; *Lambrecht*, 231 Ill. App. 3d at 434.) Instead, "the relevant inquiry is whether, upon viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements essential to the criminal conviction beyond a reasonable doubt." *Lambrecht*, 231 Ill. App. 3d at 434.

The evidence presented at trial, when viewed in a light most favorable to the prosecution, supports the trial court's determination that defendant was not entrapped. The trial court expressly found that there was no improper inducement by the law enforcement officials and that they merely afforded defendant the opportunity to commit the crime. We note that the facts in this case were heavily disputed. Although defendant contends that he was reluctant to engage in the transaction, and did so only after constant badgering, evidence

presented by the State provides a much different account. Martin Gomez testified that when he first met defendant, after having been introduced by their mutual friend, Corky, defendant inquired whether Gomez was "looking for something," and indicated that it would be no problem to provide Gomez with "four o's and a quarter," at which point Gomez gave defendant Wiess' telephone numbers. Moreover, defendant's testimony regarding his first conversation with Agent Wiess was wholly at odds with Wiess' account. While defendant testified that Corky placed the call to Wiess and then handed the telephone to defendant, Wiess testified that he placed the call to defendant after having been electronically paged. Wiess' testimony that during their first telephone conversation defendant requested that Wiess purchase drugs from him evidences that defendant conceived of the offense for which he was ultimately prosecuted.

The trial court apparently discredited defendant's account that Wiess initiated the discussion of narcotics with veiled references to defendant "getting something" for him, and that defendant disclaimed any interest or ability to provide narcotics to Wiess. While defendant maintains that he was badgered into providing narcotics, there was no testimony that any badgering occurred before defendant's first telephone conversation with Wiess. Accordingly, evidence of defendant's readiness to supply narcotics at the time of this first conversation negates the "improper inducement" element of the entrapment defense. Furthermore, defendant's testimony that Marty and Corky constantly badgered or pestered him between January and April 1991 was partially contradicted by Martin Gomez's testimony that he only met with defendant once and did not again speak with defendant except to leave a message on defendant's telephone answering machine. While defendant's testimony that Corky badgered him was not specifically contradicted, defendant failed to elaborate on the nature of this "badgering." In any event, leaving aside the issue, which we address below, of whether the State's failure to call Corky to testify raises an inference against it, the trial court, as trier of fact, was not required to accept defendant's exculpatory testimony. *People v. Loferski* (1992), 235 Ill. App. 3d 675, 682.

Moreover, consideration of the factors bearing on predisposition supports the trial court's rejection of the entrapment defense. As discussed above, the trial court was persuaded the evidence presented by the State showing that defendant's initial readiness to engage in the transaction and disbelieved the defendant's testimony that he was reluctant to do so. Moreover, the record contains evidence of defendant's familiarity with drugs. For instance, defendant appears to have

been somewhat conversant with the terminology of the drug trade. (See Lambrecht, 231 Ill. App. 3d at 436; People v. Miszkiewicz (1992), 236 Ill. App. 3d 411, 431.) Defendant was also willing to accommodate the needs of drug users, as is evidenced by his statement during the sale to Wiess that he would be able to provide four ounces every week. (See People v. Draheim (1993), 242 Ill. App. 3d 80, 89 (defendant showed an inclination to accommodate undercover officer and informant's needs by stating that he would try to get them more cocaine later).) The record contains evidence of drug use by defendant. While defendant may have told Wiess at some point that he did not like cocaine, defendant requested that Wiess let him take some of the big rocks out of the bag. Defendant also requested cannabis as part of the transaction.

According to defendant, the evidence demonstrates that he had no ready source of narcotics, indicating that he lacked a predisposition to commit the offense. Defendant notes that the transaction, although first discussed in January 1991, was not completed until May of that year. Defendant also notes that in May 1991, the transaction was postponed several times before it actually took place on May 6. We disagree with defendant that this evidence shows that defendant lacked a ready source of cocaine. According to Agent Wiess' testimony, his negotiations with defendant in January 1991 were suspended because Wiess was unwilling to complete the transaction in Chicago. There is nothing to indicate that defendant lacked a source for narcotics at this time. The discussion of a drug sale resumed on April 30, and within a week defendant actually delivered approximately $5,000 worth of cocaine which he later told police he had obtained from his cousin and his cousin's friend. The evidence shows that defendant had a ready source of narcotics.

Defendant also argues that the evidence does not show that he was making a profit on the sale. While prior to the sale itself defendant told Agent Wiess that he was not making any money on the deal, defendant told the officers who arrested him that he participated in the sale because he needed the money, apparently because of financial problems he was experiencing. (Cf. People v. Singletary (1992), 237 Ill. App. 3d 503, 506-07.) Moreover, defendant was willing to profit from the transaction by taking cannabis and some of the cocaine itself.

It is true that evidence does not show that defendant was engaged in a course of conduct involving similar offenses and defendant had no prior convictions for drug offenses. However, these factors do not overcome the other evidence of defendant's willingness to make

unlawful sales when the opportunity presented itself. (*People v. Singletary* (1992), 237 Ill. App. 3d 503, 507.) Nor does the fact that defendant was not observed cutting or testing the drugs preclude a finding of predisposition.

In support of his argument that he was entrapped, defendant cites *People v. Poulos* (1990), 196 Ill. App. 3d 653, and *People v. Fisher* (1979), 74 Ill. App. 3d 330. Both cases are factually distinguishable. In *Poulos*, the defendant had purchased a game room business from an individual who was working as a government informant. During the course of their business relationship, the informant repeatedly asked the defendant to find someone to supply cocaine to "Greg," who was, in actuality, an undercover police officer. The defendant testified that he repeatedly refused these requests. Later the informant asked the defendant to sell Greg a package containing cocaine which the informant himself acquired. Defendant at first refused, but then relented. Under these circumstances, the appellate court reversed the defendant's conviction. *Poulos* is distinguishable in that the State did not present evidence of the defendant's predisposition. (See *People v. Martin* (1991), 219 Ill. App. 3d 1064, 1078.) Moreover, in *Poulos* the evidence was apparently uncontradicted that the defendant agreed to participate in the sale, which involved narcotics supplied by the informant, only after repeated urging by the informant. Here although the evidence was conflicting, the testimony of the State's witnesses portrayed defendant as a willing participant from the outset.

Defendant's reliance on *Fisher* is similarly misplaced. In *Fisher*, the defendant, who was working as a dancer at a tavern, sold tablets represented to be amphetamines to an undercover police officer present at the tavern. The defendant testified that the officer had previously asked her to sell him drugs on three occasions during the preceding week, but she refused. The defendant testified that she was afraid of the officer and wanted him to leave her alone, so she sold him some tablets previously given to her by another patron of the tavern which she thought were amphetamines. The undercover officer did not think he had asked the defendant for drugs prior to the occasion when he actually purchased them, but he did not deny that it was possible he had done so. Like *Poulos, Fisher* is distinguishable from the present case because of the *uncontradicted* evidence of the defendant's repeated refusal to supply drugs prior to the actual sale and the apparent lack of evidence of predisposition. Defendant contends that in the present case, as in *Fisher*, the undercover officers were unable to procure drugs from the defendant. However, *Fisher*

involved refusal, whereas the present case merely involved delay. Here, according to the evidence presented by the State, defendant was never unwilling to supply narcotics.

Defendant also argues that because the State failed to call Corky as a witness to rebut defendant's testimony that he was badgered to commit the offense, an inference arises against the State. Defendant also maintains that the State's failure to call Corky to rebut defendant's testimony that Corky supplied the narcotics requires that his conviction be reversed. In support of the latter contention, defendant cites *People v. Martin* (1984), 124 Ill. App. 3d 590, 593, which contains the following statement:

> "While the People are correct that there is no rule establishing entrapment as a matter of law solely because the government provided the controlled substance which the accused was charged with delivering (*People v. Cross* (1979), 77 Ill. 2d 396, 396 N.E.2d 812), it is persuasive evidence that if the substance was supplied by the government or its paid informer and the State fails to call the informer to rebut the defendant's testimony that the informant supplied the drugs to the defendant, a conviction for selling the drugs may not be sustained." (*Martin*, 124 Ill. App. 3d at 593.)

Defendant suggests that this passage establishes a *per se* rule requiring reversal. We disagree. While the language in *Martin* is somewhat confusing, a *per se* rule of reversal would be contrary to the holding of the Illinois Supreme Court in *People v. Cross* (1979), 77 Ill. 2d 396, which expressly held that a conviction for unlawful delivery of a controlled substance need not be reversed simply because the government supplied the substance forming the basis for the prosecution. The court observed:

> "The offense in question here is the unlawful delivery of a controlled substance and, although the government may have supplied the substance, the critical inquiry is whether the 'criminal purpose' of *selling* these substances originated with the defendants [citation]. By supplying an individual with controlled substances, the government is merely facilitating or providing the opportunity for the individual to make an unlawful delivery. This is not entrapment under our entrapment statute [citation]." (Emphasis in original.) *Cross*, 77 Ill. 2d at 404.

Under *Cross*, the State's unexplained failure to call an informant to rebut the defendant's testimony that the informant supplied the narcotics may give rise to an inference against the State. (*Cross*, 77 Ill. 2d at 406; see also *People v. Johnson* (1989), 191 Ill. App. 3d 940,

945; *People v. Simon* (1981), 101 Ill. App. 3d 89, 95.) For several reasons, however, we believe an inference against the State would be inappropriate under the circumstances of this case.

In *People v. Irby* (1992), 237 Ill. App. 3d 38, 68, which arose from a murder prosecution, we discussed the general principles regarding the State's failure to call a witness:

> "The State is not obligated to call every witness who might testify concerning evidence of a crime. [Citations.] The failure to do so does not ordinarily create a presumption that the testimony of that witness would be unfavorable to the State. [Citation.] As a general rule, if a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and the witness' relationship with the State is such that it would ordinarily be expected that to favor it, the State's failure to call the witness *may* give rise to a permissible inference that, if the witness were called, the witness' testimony would have been unfavorable to the State's case. *** However, no negative inferrence is raised when the witness is also known and available to the defense yet is not called by it." (Emphasis in original.) *Irby*, 237 Ill. App. 3d at 68-69.

In the present case, even were we to assume, *arguendo*, that Corky should be considered an "agent" of the State for entrapment purposes generally, his relationship with the State was not such that he would ordinarily be expected to favor the State in his testimony. Corky was not enlisted by law enforcement officials to act as an informant and apparently had no agreement with the State. While Agent Wiess knew that Corky was assisting Martin Gomez, Wiess apparently had minimal contact with Corky. In addition, Corky was known to the defense, and there is no reason to believe Corky was any less available to the defense than to the State. (See *People v. Parsons* (1991), 222 Ill. App. 3d 823, 831.) Indeed, it was defendant who interjected Corky into the proceedings. When defendant first testified that Corky badgered him to sell narcotics, and later testified that Corky had supplied the narcotics, the State claimed surprise, asserting that it believed that defendant's entrapment defense would be based upon Agent Wiess' conduct. Near the end of the second day of trial, the assistant State's Attorney indicated that after hearing defendant's testimony he attempted to contact Corky but was unsuccessful. The assistant State's Attorney indicated that he might present Corky's testimony on the following day, although he did not

ultimately do so. Under these circumstances, the State's failure to call Corky to testify is not entirely unexplained.

Finally, any inference against the State regarding the source of the narcotics would be severely undermined by the fact that defendant's testimony that Corky supplied the cocaine was contradicted by his own statements to police, following his arrest, that he obtained the cocaine from his cousin, Jeff Higgins, and John Lofton.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

McLAREN and GEIGER, JJ., concur.